# EXHIBIT 1

# OPERATING AGREEMENT
# FOR
# The Inn at Del Monte Beach
# A California Limited Liability Company

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1. | ORGANIZATIONAL MATTERS | 1 |
| 1.1. | Name | 1 |
| 1.2. | Term. | 1 |
| 1.3. | Office and Agent. | 1 |
| 1.4. | Business of the Company | 1 |
| ARTICLE 2. | CAPITAL CONTRIBUTIONS | 2 |
| 2.1. | Capital Contributions. | 2 |
| 2.2. | Capital Accounts. | 2 |
| 2.3. | No Interest. | 2 |
| ARTICLE 3. | MEMBERS | 2 |
| 3.1. | Limited Liability. | 2 |
| 3.2. | Admission of Additional Members | 2 |
| 3.3. | Withdrawals or Resignations. | 2 |
| 3.4. | Payments to Members. | 3 |
| 3.5. | Expulsion of Members. | 3 |
| 3.6. | Members Not Agents. | 3 |
| 3.7. | Competing Activities. | 3 |
| 3.8. | Transactions With The Company. | 4 |
| 3.9. | Remuneration To Members. | 4 |
| 3.10. | Voting Rights. | 4 |
| 3.10.1. | Unanimous Approval. | 4 |
| 3.10.2. | Approval by Members Holding a Majority Interest. | 4 |
| 3.11. | Meetings of Members. | 5 |
| 3.11.1. | Date, Time and Place of Meetings of Members. | 5 |
| 3.11.2. | Power to Call Meetings. | 5 |
| 3.11.3. | Notice of Meeting. | 5 |
| 3.11.4. | Validity of Action. | 5 |
| 3.11.5. | Action by Written Consent without a Meeting. | 6 |
| 3.11.6. | Adjourned Meeting; Notice. | 6 |
| 3.11.7. | Quorum. | 6 |
| 3.11.8. | Waiver of Notice or Consent. | 6 |
| 3.11.9. | Telephonic Participation by Member at Meetings. | 7 |
| 3.11.10. | Record Date. | 7 |
| 3.11.11. | Proxies. | 7 |
| 3.12. | Certificate of Membership Interest. | 8 |
| 3.12.1. | Certificate. | 8 |

## TABLE OF CONTENTS
(Continued)

Page


3.12.2. Cancellation of Certificate. . . . . 8
3.12.3. Replacement of Lost, Stolen, or Destroyed Certificate. . 8

ARTICLE 4. MANAGEMENT AND CONTROL OF THE COMPANY . . . . 9

4.1. Management of the Company by Manager. . . . . 9
4.1.1. Exclusive Management by Manager. . . 9
4.1.2. Agency Authority of Manager. . . . . 9
4.2. Election of Manager. . . . . . . . . . . . . 9
4.2.1. Number, Term and Qualifications. . . 9
4.2.2. Resignation. . . . . . . . . . . . . 9
4.2.3. Removal. . . . . . . . . . . . . . . 9
4.2.4. Vacancies. . . . . . . . . . . . . . 10
4.3. Powers of Manager. . . . . . . . . . . . . . 10
4.3.1. Powers of Manager. . . . . . . . . . 10
4.3.2. Limitations on Powers of Manager. . 10
4.4. Performance of Duties; Liability of Manager. 11
4.5. Devotion of Time. . . . . . . . . . . . . . 11
4.6. Competing Activities. . . . . . . . . . . . 11
4.7. Transactions between the Company and the Manager. 11
4.8. Payments to Manager. . . . . . . . . . . . . 12
4.8.1. Management Fee. . . . . . . . . . . 12
4.8.2. Services Performed by Manager or Affiliates 12
4.8.3. Expenses. . . . . . . . . . . . . . 12
4.9. Officers. . . . . . . . . . . . . . . . . . 12
4.9.1. Appointment of Officers. . . . . . . 12
4.10. Limited Liability. . . . . . . . . . . . . . 13
4.11. Membership Interests of Manager. . . . . . . 13

ARTICLE 5. ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS . . . . . . . . . . . . . . . . 13

5.1. Definitions. . . . . . . . . . . . . . . . . 13
5.2. Allocations of Net Profit and Net Loss. . . . 14
5.2.1. Net Loss. . . . . . . . . . . . . . 14
5.2.2. Net Profit. . . . . . . . . . . . . 14
5.3. Special Allocations. . . . . . . . . . . . . 14
5.3.1. Minimum Gain Chargeback. . . . . . . 14
5.3.2. Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. . . . . 14
5.3.3. Nonrecourse Deductions. . . . . . . 15
5.3.4. Member Nonrecourse Deductions. . . . 15
5.3.5. Qualified Income Offset. . . . . . . 15
5.4. Code Section 704(c) Allocations. . . . . . . 16
5.5. Distribution of Assets by the Company. . . . 16

**TABLE OF CONTENTS**
(Continued)


| | | | Page |
|---|---|---|---|
| ARTICLE 6. | TRANSFER AND ASSIGNMENT OF INTERESTS . . . . | | 16 |
| 6.1. | Transfers. . . . . . . . . . . . . . . . . . . . | | 16 |
| | 6.1.2. | Transfer of Economic Interest. . . . | 17 |
| | 6.1.3. | Rights of Company and Members in Transferred Membership Interests. | 17 |
| 6.2. | Voluntary Withdrawal. . . . . . . . . . . . . . | | 19 |
| 6.3. | No Release of Liability. . . . . . . . . . . . | | 19 |
| 6.4. | Involuntary Withdrawal. . . . . . . . . . . . . | | 19 |
| ARTICLE 7. | CONSEQUENCES OF DISSOLUTION EVENTS ANDTERMINATION OF MEMBERSHIP INTEREST . . . . . . . . . . . . . . | | 19 |
| 7.1. | Dissolution Event. . . . . . . . . . . . . . . | | 19 |
| 7.2. | Withdrawal. . . . . . . . . . . . . . . . . . . | | 20 |
| 7.3. | Purchase Price. . . . . . . . . . . . . . . . . | | 20 |
| 7.4. | Notice of Intent to Purchase. . . . . . . . . . | | 20 |
| 7.5. | Election to Purchase Less Than All of the Former Member's Interest. . . . . | | 20 |
| 7.6. | Payment of Purchase Price. . . . . . . . . . . | | 20 |
| 7.7. | Closing of Purchase of Former Member's Interest. | | 21 |
| ARTICLE 8. | ACCOUNTING, RECORDS, REPORTING BY MEMBERS . . | | 21 |
| 8.1. | Books and Records. . . . . . . . . . . . . . . | | 21 |
| 8.2. | Reports. . . . . . . . . . . . . . . . . . . . . 22 | | |
| 8.3. | Bank Accounts. . . . . . . . . . . . . . . . . | | 22 |
| 8.4. | Tax Matters for the Company. . . . . . . . . . | | 22 |
| ARTICLE 9. | DISSOLUTION AND WINDING UP . . . . . . . . . . | | 22 |
| 9.1. | Conditions of Dissolution. . . . . . . . . . . | | 22 |
| 9.2. | Winding Up. . . . . . . . . . . . . . . . . . . | | 23 |
| 9.3. | Order of Payment of Liabilities Upon Dissolution. | | 23 |
| 9.4. | Limitations on Payments Made in Dissolution. | | 23 |
| 9.5. | Certificates. . . . . . . . . . . . . . . . . . | | 23 |
| ARTICLE 10. | INDEMNIFICATION . . . . . . . . . . . . . . . . | | 23 |
| 10.1. | Indemnification of Agents. . . . . . . . . . . | | 23 |
| ARTICLE 11. | INVESTMENT REPRESENTATIONS . . . . . . . . . . | | 24 |
| 11.1. | Preexisting Relationship or Experience. . . . | | 24 |
| 11.2. | No Advertising. . . . . . . . . . . . . . . . . | | 24 |
| 11.3. | Investment Intent. . . . . . . . . . . . . . . | | 24 |

# TABLE OF CONTENTS
(Continued)


| | | Page |
|---|---|---|
| ARTICLE 12. | MISCELLANEOUS | 24 |
| 12.1. | Counsel to the Company | 24 |
| 12.2. | Complete Agreement | 25 |
| 12.3. | Binding Effect | 25 |
| 12.4. | Interpretation | 25 |
| 12.5. | Jurisdiction | 25 |
| 12.6. | Arbitration | 25 |
| 12.7. | Severability | 26 |
| 12.8. | Notices | 26 |
| 12.9. | Amendments | 26 |
| 12.10. | Multiple Counterparts | 26 |
| 12.11. | Attorneys' Fees | 26 |
| 12.12. | Remedies Cumulative | 27 |
| 12.13. | Consent of Spouse | 27 |

# OPERATING AGREEMENT
# FOR
# THE INN AT DEL MONTE BEACH
## A California Limited liability Company

THIS OPERATING AGREEMENT (this "Agreement") is made as of November 1, 2007, by and between the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A. The Members have previously filed Articles of Organization (the "Articles") for The Inn at Del Monte Beach (the "Company"), a limited liability company under the laws of the State of California, with the California Secretary of State.

B. The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members of this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1.
## ORGANIZATIONAL MATTERS

1.1 Name. The name of the Company shall be "The Inn at Del Monte Beach." The Company has conduct business under that name or any other name approved by the Members.

1.2. Term. The term of the Company will commence as of the date of the filing of the Articles, and unless sooner terminated under Section 9.1, shall terminate on December 31, 2050.

1.3. Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be at 680 E Romie Lane, Salinas, California, or such location as the Members may determine. The registered agent shall be Linda Seeley as stated in the Articles of Organization, or as otherwise subsequently determined by the Members.

1.4. Business of the Company. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

1.4.1. owning and operating real estate; and

1.4.2. such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE 2.
## CAPITAL CONTRIBUTIONS

2.1. Capital Contributions. Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit A attached hereto. No Member shall be required to make any additional contributions to the capital of the Company. Additional contributions to the capital of the Company shall be made only with a two-thirds (2/3) vote of the Members. Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2. Capital Accounts. The Company shall establish an individual capital account ("Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations section 1.704-1(b)(2)(iv). Upon a valid transfer of a Member's interest in the Company ("Membership Interest") in accordance with Article 6, such Member's Capital Account shall carry over to the new owner.

2.3. No Interest. The Company shall not pay any interest on capital contributions.

## ARTICLE 3.
## MEMBERS

3.1. Limited Liability. Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

3.2. Admission of Additional Members. Additional Members may be admitted with the approval of all Members. Additional Members will participate in the "Net Profits," "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution. Each new Member must comply with all the terms of this Operating Agreement as amended.

3.3. Withdrawals or Resignations. Any Member who is under an obligation to render services to the Company may withdraw or resign as a Member at any time upon one hundred twenty (120) days prior written notice to the Company, without prejudice to the rights, if

any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a transferee as described in Section 6.1.2 and such Membership Interest shall be subject to purchase and sale as provided in Section 7.2. No other Member may withdraw, retire or resign from the Company.

3.4. Payments to Members. Except as specified in this Agreement or pursuant to a transaction permitted by Section 3.7, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

3.5. Expulsion of Members. Any Member may be expelled from the Company upon the affirmative vote of Members, excluding the Member whose withdrawal is being voted upon, holding not less than seventy-five (75%) percent of the Membership Interests to terminate such Member's Membership Interest. The Members may only vote to terminate another Member's interest if that Member — whose interest is being voted upon — has committed an act which is in breach of his fiduciary duty to the Company and which has damaged the Company in some material manner.

3.6. Members Not Agents. Pursuant to Section 4.1 and the Articles of Organization, the management of the Company is vested in one (1) Manager. The Members have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles of Organization, and except as expressly required by the Beverly-Killea Limited Liability Company Act. No Member, acting solely in the capacity of a Member, is an agent of the Company, nor does any Member, unless expressly and duly authorized in writing to do so by a Manager, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf, or to render it liable for any purpose.

3.7. Competing Activities. The Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in independently or with others, any business activity of any type or description, including, without limitation, those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members shall not be obligated to present any investment

opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims which they may otherwise have against the other Members and their officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

3.8. Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior approval of a Manager, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

3.9. Remuneration To Members. Except as otherwise specifically provided in this Agreement, no Member is entitled to remuneration for acting in the Company business.

3.10. Voting Rights. Except as expressly provided in this Agreement or the Articles, Members shall have no voting, approval or consent rights. Members have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

3.10.1. Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event, as defined in Section 7.1, or an assignor of a Membership Interest:

3.10.1.1. A decision made pursuant to Article 7 to continue the business of the Company after the occurrence of a Dissolution Event;

3.10.1.2. The transfer of a Membership Interest and admission of the Assignee as a Member of the Company in accordance with Article 6;

3.10.1.3. Any amendment of the Articles or this Agreement; and

3.10.1.4. A decision to compromise the obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

3.10.2. Approval by Members Holding a Majority Interest. Except as set forth in Section 4.3, in all other matters

in which a vote, approval or consent of the Members is required, a vote, consent or approval of a Majority Interest shall be sufficient to authorize or approve such act. For purpose of this Agreement, "Majority Interest" shall mean one or more Percentage Interests of Members which taken together exceed fifty percent (50%) of the aggregate of all Percentage Interests. "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Membership Interest" in Exhibit A.

3.11. Meetings of Members.

3.11.1. Date, Time and Place of Meetings of Members. Meetings of Members may be held at such date, time and place within or without the State of California as the Managers may fix from time to time, or if the Managers are unable to agree to such time and place, Members holding a Majority Interest shall determine the time and place. No annual or regular meetings of Members are required. At any Members' meeting, the Managers shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, which shall be placed in the minute book of the Company.

3.11.2. Power to Call Meetings. Meetings of the Members may be called by any Manager, or upon written demand of Members holding more than five percent (5%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

3.11.3. Notice of Meeting. Written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Corporations Code section 17104(c)(2) not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to a Manager by any person entitled to call a meeting of Members, the Managers shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

3.11.4. Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

3.11.5. Action by Written Consent without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is signed and delivered to the Company within sixty (60) days of the record date for that action by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted. All such consents shall be filed with the Managers or the secretary, if any, of the Company and shall be maintained in the Company records. Any Member giving a written consent, or the Member's proxy holders, may revoke the consent by a writing received by the Managers or secretary, if any, of the Company before written consents of the number of votes required to authorize the proposed action have been filed.

Unless the consents of all Members entitled to vote have been solicited in writing, (i) notice of any Member approval of an amendment to the Articles or this Agreement, a dissolution of the Company, or a merger of the Company, without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval, and (ii) prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

3.11.6. Adjourned Meeting; Notice. A Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 3.11.7. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Managers shall set a new record date. At any adjourned meeting, the Company may transact any business which might have been transacted at the original meeting.

3.11.7. Quorum. The presence in person or by proxy of a Majority Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest.

3.11.8. Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever

held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that the attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 3.11.4.

3.11.9. Telephonic Participation by Member at Meetings. Members may participate in any Members' meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

3.11.10. Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, a Manager, or Members representing more than ten percent (10%) of the Percentage Interests may fix, in advance, a record date that is not more than sixty (60) days, nor less than ten (10) days, prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date is fixed, the record date shall be as set forth in Corporations Code section 17104(k).

3.11.11. Proxies. Every Member entitled to vote for Managers or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Managers or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy, by a writing delivered to the Company stating that the proxy is revoked, or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person

executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Corporations Code sections 705(e) and 705(f).

3.12. Certificate of Membership Interest.

3.12.1. Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Managers but shall be issued substantially in conformity with the following requirements. The certificates of membership shall be respectively numbered serially, as they are issued, shall be impressed with the Company seal or a facsimile thereof, if any, and shall be signed by a Manager (or officers) of the Company. Each certificate of membership shall state the name of the Company, the fact that the Company is organized under the laws of the State of California as a limited liability company, the name of the person to whom the certificate is issued, the date of issue, and the Percentage Interest represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Managers.

3.12.2. Cancellation of Certificate. Except as herein provided with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until former certificates for a like number of Membership Interests shall have been surrendered and cancelled. All certificates of membership surrendered to the Company for transfer shall be cancelled.

3.12.3. Replacement of Lost, Stolen, or Destroyed Certificate. Any Member claiming that his or her certificate of membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Managers, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

## ARTICLE 4.
## MANAGEMENT AND CONTROL OF THE COMPANY

4.1. Management of the Company by Manager.

4.1.1. Exclusive Management by Manager. Subject to the provisions of this Agreement relating to actions required to be approved by the Members, the business, property and affairs of the Company will be managed and all powers of the Company will be exercised by or under the direction of the Manager.

4.1.2. Agency Authority of Manager. Subject to Section 4.3.2, the Manager is authorized to endorse checks, drafts and other evidence of indebtedness in any amount of money made payable to the order of the Company. The Manager may also sign contracts, obligations, checks, drafts and other instruments obligating the Company to pay any amount of money on behalf of the Company.

4.2. Election of Manager.

4.2.1. Number, Term and Qualifications. The Company will initially have one (1) Manager, being Linda Seeley. The number of Managers of the Company will be fixed from time to time by the affirmative vote or written consent of a Majority Interest, provided that in no instance will there be less than one (1) Manager, and provided further, that unless the Manager resigns or is removed, the Manager will hold office until a successor has been elected and qualified. The Manager will be elected by the affirmative vote or written consent of Members holding a Majority Interest. The Manager need not be a Member, an individual, a resident of the State of California, or a citizen of the United States.

4.2.2. Resignation. The Manager may resign at any time by giving written notice to the Members (and remaining Managers, if applicable) without prejudice to the rights, if any, of the Company under any contract to which the Manager is a party. The resignation of the Manager will take effect upon receipt of that notice or at such later time as will be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation is not necessary to make it effective. The resignation of the Manager who is also a Member will not affect the Manager's rights as a Member and will not constitute a withdrawal of a Member.

4.2.3. Removal. The Manager may be removed at any time, with cause, by the affirmative vote of a Majority Interest at a meeting called expressly for that purpose, or by the written consent of a Majority Interest. Any removal will terminate any and all rights, if any, of the Manager under any employment contract with the Company. If the Manager is also a Member when the Manager is terminated, then this termination will not affect the

Manager's rights as a Member or constitute a withdrawal of a Member. For purpose of this section, "cause" means fraud, gross negligence, willful misconduct, embezzlement or a breach of such Manager's obligations under this Agreement or any employment contract with the Company.

4.2.4. <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Managers may be filled by the affirmative vote or written consent of a Majority Interest (or by a majority of the remaining Managers, if there is more than one (1) Manager.)

4.3. <u>Powers of Manager</u>.

4.3.1. <u>Powers of Manager</u>. Without limiting the generality of Section 4.1, but subject to Section 4.3.2 and to the express limitations set forth elsewhere in this Agreement, the Manager has all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code section 17003.

4.3.2. <u>Limitations on Powers of Manager</u>. There is no limitation on the amount of debt or liability that the Manager can incur on behalf of the Company, so long as the Manager complies with Section 4.1.2. However, the Manager does not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of a Majority Interest of the Members:

4.3.2.1. The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a three-month period, except in the orderly liquidation and winding up of the business of the Company upon its duly-authorized dissolution;

4.3.2.2. The merger of the Company with another limited liability company or limited partnership;

4.3.2.3. The merger of the Company with a corporation or a general partnership or other Person;

4.3.2.4. The establishment of different classes of Members;

4.3.2.5. Any act which would make it impossible to carry on the ordinary business of the Company; and

4.3.2.6. Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

4.4. Performance of Duties; Liability of Manager. The Manager is not liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage is the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Manager will perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. Any Manager who so performs the duties of Manager does not have any liability by reason of being or having been a Member of the Company.

4.5. Devotion of Time. The Manager is not obligated to devote all of its time or business efforts to the affairs of the Company. The Manager will devote whatever time, effort and skill as it deems appropriate for the operation of the Company.

4.6. Competing Activities. The Manager and, if applicable, the Manager's officers, directors, shareholders, partners, members, managers, agents and employees (collectively "Affiliates") may engage or invest in, independently or with others, any business activity of any type or description, including, without limitation, those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member has any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Manager is not obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members acknowledge that the Manager and its Affiliates may own and manage other businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and its officers, directors, shareholders, partners, members, managers, agents and employees as a result of any of such activities.

4.7. Transactions between the Company and the Manager. Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause its Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as the following conditions are met:

4.7.1. Such transaction is not expressly prohibited by this Agreement; and

4.7.2. The terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company.

4.8. Payments to Manager. Except as specified in this Agreement, no Manager or Affiliate of a Manager is entitled to remuneration for services rendered or goods provided to the Company. The Manager and its Affiliates can receive only the following payments:

4.8.1. Management Fee. The Company may pay the Manager a monthly fee for services in connection with the management of the Company in an amount to be determined from time to time by an affirmative vote of Members holding at least a Majority Interest. No Manager will be prevented from receiving a management fee because the Manager is also a Member of the Company.

4.8.2. Services Performed by Manager or Affiliates. The Company will pay the Manager or Affiliates of the Manager for services rendered or goods provided to the Company to the extent that:

4.8.2.1. The Manager is not required to render such services or goods themselves without charge to the Company; and

4.8.2.2. The fees paid to such Manager or Affiliates do not exceed the fees that would be payable to an independent responsible third party that is willing to perform such services or provide such goods.

4.8.3. Expenses. The Company will reimburse the Manager and its Affiliates for the actual cost of materials used for or by the Company. The Company will also pay or reimburse the Manager or its Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare and file the Articles and this Agreement. Except as otherwise provided herein, the Manager and its Affiliates will not be reimbursed by the Company for the following expenses: (i) salaries, compensation or fringe benefits of the Manager or its Affiliates; (ii) overhead expenses of the Manager or its Affiliates, including, without limitation, rent and general office expenses; and (iii) the cost of providing any services or goods for which the Manager or its Affiliates are entitled to compensation under this Agreement.

4.9. Officers.

4.9.1. Appointment of Officers. The Manager may appoint officers at any time. The officers of the Company may include a chairperson, president, vice president, secretary and chief financial officer. The officers will serve at the pleasure of the Manager, subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of California or citizen of the United States. If a Manager is not an

individual, such Manager's officers may serve as officers of the Company if elected by the Manager. The officers will exercise such powers and perform such duties as determined from time to time by the Manager.

4.10. Limited Liability. No person who is a Manager or officer or both a Manager and officer of the Company is personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer or both a Manager and officer of the Company.

4.11. Membership Interests of Manager. Except as otherwise provided in this Agreement, Membership Interests held by a Manager as a Member entitles the Manager to all the rights of a Member, including, without limitation, the economic, voting, information and inspection rights of a Member.

## ARTICLE 5.
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1. Definitions. When used in this Agreement, the following terms shall have the meanings set forth below:

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations section 1.704-2(d).

"Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulations section 1.752-1(a)(2).

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2. Allocations of Net Profit and Net Loss.

5.2.1. Net Loss. Net Loss shall be allocated to the Members in proportion to their Membership Interest. Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of

Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.2.1). Any loss reallocated under this Section 5.2.1 shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article 5, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article 5, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article 5 if no reallocation of losses had occurred under this Section 5.2.1.

5.2.2. Net Profit. Net Profit shall be allocated to the Members in proportion to their Membership Interest.

5.3. Special Allocations. Notwithstanding Section 5.2,

5.3.1. Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Treasury Regulations section 1.704-2(g)(2). Allocations pursuant to this Section 5.3.1 shall be made in proportion to the amounts required to be allocated to each Member under this Section 5.3.1. The items to be so allocated shall be determined in accordance with Treasury Regulations section 1.704-2(f). This Section 5.3.1 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations section 1.704-2(f) and shall be interpreted consistently therewith.

5.3.2. Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any

fiscal year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations section 1.704-2(i)(5)). Allocations pursuant to this Section 5.3.2 shall be made in proportion to the amounts required to be allocated to each Member under Section 5.3.2. The items to be so allocated shall be determined in accordance with Treasury Regulations section 1.704-2(i)(4). This Section 5.3.2 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations section 1.704-2(i)(4) and shall be interpreted consistently therewith.

5.3.3. Nonrecourse Deductions. Any nonrecourse deductions (as defined in Treasury Regulations section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

5.3.4. Member Nonrecourse Deductions. Those items of Company loss, deduction, or Code section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations section 1.704-2(i).

5.3.5. Qualified Income Offset. If a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 5.3.5 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article 5 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 5.3.5 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article 5 if such unexpected adjustments, allocations, or distributions had not occurred.

5.4. Code Section 704(c) Allocations. Notwithstanding any other provision in this Article 5, in accordance with Code section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5. Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, Members holding a majority of the Membership Interests may elect from time to time to cause the Company to make distributions. Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

## ARTICLE 6.
## TRANSFER AND ASSIGNMENT OF INTERESTS

6.1. Transfers. Except as herein provided, no Member may Transfer all, or any portion of, or any interest or rights in, the Membership Interest owned by the Member. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The attempted Transfer of any portion or all of a Membership Interest in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect, except any Transfer mandated by operation of law and then only to the extent necessary to give effect to such Transfer by operation of law.

6.1.1. A Member may Transfer all or any portion of or any interest or rights in the Member's Economic Interest if each of the following conditions ("Conditions of Transfer") is satisfied:

6.1.1.1. the Transfer may be accomplished without registration, or similar process, under federal and state securities laws;

6.1.1.2. the transferee delivers to the Company a written agreement to be bound by the terms of Article 6 of this Agreement;

6.1.1.3. the Transfer will not result in the termination of the Company pursuant to IRC section 708;

6.1.1.4. the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5. the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred Membership Interest; and

6.1.1.6. the transferor complies with the provisions set forth in Section 6.1.3. Notwithstanding the foregoing, the Economic Interest of any Member may be transferred, without compliance with Section 6.1.3, by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member or to a trust for the benefit of the Member or such enumerated relative, or to any affiliate owned by the Member. Any subsequent transfer of any such Economic Interest shall be subject to the provisions of Section 6.1.3, unless said subsequent transferee is a spouse, parent, sibling, in-law, child or grandchild of a Member or a trust for the benefit of the Member or such Member's relative, or to an affiliate, as provided in this section. An inter vivos transfer of a Member's interest to that Member as a trustee in a trust established by that Member shall be deemed to also transfer the Membership Interest, provided that a subsequent transfer by the Member as trustee, or the appointment of a subsequent trustee in any such trust shall be deemed a transfer of an Economic Interest only and shall be otherwise subjection to the provisions of Section 6.1.

6.1.2. <u>Transfer of Economic Interest</u>. If the Conditions of Transfer are satisfied, the Member may Transfer all or any portion of the Member's Economic Interest. Except as specifically provided in this Agreement, the Transfer of an Economic Interest pursuant to this Section 6.1 shall not result in the transfer of any of the transferor's other Membership rights. The transferee of the Economic Interest shall have no right to: (i) become a Member; (ii) exercise any Membership rights other than those specifically pertaining to the ownership of an Economic Interest; or (iii) act as an agent of the Company. The transfer of a Membership Interest by a member which shall comply with paragraph 6.1.3. and shall otherwise comply with this Article 6, shall be effective to transfer a Membership Interest to the Transferee together with all rights of Membership. The admission of the holder of a transferred Economic Interest to status of Membership shall be subject to Section 3.2 and in the absolute discretion of the Members voting thereon.

6.1.3. <u>Rights of Company and Members in Transferred Membership Interests</u>.

6.1.3.1. If any Member desires to transfer all or any part of his, her or its Membership Interest, such Member

shall notify the Company and the other Members in writing of such desire and, for a period of thirty (30) days thereafter, the Remaining Members and the Company shall negotiate with respect to the purchase of such Member's Membership Interest. During such period, the Member desiring to transfer such Membership Interest may not otherwise solicit a transferee for such Membership.

6.1.3.2. If the time period described in subsection 6.1.3.1 expires without an agreement being reached as to the purchase of the Membership Interest referred to therein, the Member desiring to transfer his, her or its Membership Interest may solicit transferees. In such event, each time a Member proposes to transfer all or any part of his, her or its Membership Interest (or as required by operation of law or other involuntary transfer to do so), such Member shall first offer such Membership Interest to the Company, and then the other Members, in accordance with the following provisions:

6.1.3.2.1. Such Member shall deliver a written notice ("Option Notice") to the Company and the Remaining Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the Membership Interest to be transferred, (iii) the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest, and (iv) the name and address of the proposed transferee.

6.1.3.2.2. Within thirty (30) days after receipt of the Option Notice, the Company shall have the right, but not the obligation, to purchase all or part of the Membership Interest upon the price and terms of payment in the Option Notice. The Remaining Members, or any of them, shall thereafter, for thirty (30) days, have the pro rata right, but not the obligation, to purchase all or part of the Membership Interest upon the price and terms of payment in the Option Notice. The failure of a Member to purchase a pro rata share shall proportionately increase the share which may be purchased by the other Remaining Members. If the Option Notice provides for the payment of non-cash consideration, the Company or the Remaining Members, as appropriate, may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Company (excluding the vote of the transferring Member).

6.1.3.2.3. If the Company and the other Remaining Members elect to purchase or obtain any or all of the Membership Interest designated in the Option Notice, as provided in this Article 6, then the closing of such purchase shall occur within sixty (60) days after receipt of such notice and the transferring Member, the Company and/or the Remaining Members shall execute such documents and instruments and make such deliveries as may be reasonably required to consummate such purchase.

6.1.3.2.4. If the Company and the Remaining Members elect not to purchase or obtain, or default in their obligation to purchase or obtain, all of the Membership Interest designated in the Option Notice, then the transferring

Member may elect to transfer the entire Membership Interest described in the Option Notice, to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the Company's and the other Members' rights to purchase such Membership Interest, and (ii) is made on terms no less favorable to the transferring Member than as designated in the Option Notice. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section 6.1.3.2.4 prior to any other or subsequent transfer of such Membership Interest.

6.1.3.2.5. Upon a transfer in violation of this Article 6, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Remaining Members, a transfer in violation of this Article 6 would cause the termination of the Company under the Code, in the sole discretion of the Remaining Members, the transfer shall be null and void.

6.2. Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company, except as otherwise provided by this Agreement.

6.3. No Release of Liability. The admission of a substitute Member, pursuant to Sections 6.1 or 6.2, does not release the Member who assigned, sold or transferred his, her or its Membership Interest from any liability that such Member may have to the Company.

6.4. Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, which is defined as a transfer in violation of this Article 6, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is not dissolved, the successor Interest Holder shall have all the rights of an Interest Holder, but shall not have the right to exercise any other rights of a Member.

## ARTICLE 7.
## CONSEQUENCES OF DISSOLUTION EVENTS AND TERMINATION OF MEMBERSHIP INTEREST

7.1. Dissolution Event. Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member ("Dissolution Event"), the Company shall dissolve unless two-thirds (2/3) of the remaining Members ("Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the

Company. If the Remaining Members so consent, the Company and/or the Remaining Members shall have the right to purchase, and if such right is exercised, the Member (or his or her legal representative) whose actions or conduct resulted in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest ("Former Member's Interest") as provided in this Article 7.

7.2. Withdrawal. Notwithstanding Section 7.1, upon the withdrawal by a Member in accordance with Section 3.3 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall have the right to purchase, and if such right is exercised, the Former Member shall sell, the Former Member's Interest as provided in this Article 7.

7.3. Purchase Price. The purchase price for the Former Member's Interest will be the fair market value of the Former Member's Interest, as the Former Member, or his successor or his estate, and the Company, or Members purchasing the Former Member's Interest, may agree upon. If the parties cannot agree on the fair market value of the Former Member's Interest, then the fair market value will be determined by an independent appraiser selected by agreement of the Company, or Members purchasing the Former Member's Interest, and the Former Member, or his successor or his estate. If the parties cannot agree on an appraiser, the parties agree to submit the dispute to arbitration in accordance with the rules of the American Arbitration Association then in effect.

7.4. Notice of Intent to Purchase. Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Section 7.3, the Company shall have a first right to purchase the Former Member's Interest. Thereafter, the Remaining Members shall have the pro rata right, exercisable within the following thirty (30) days, to purchase the remaining portion of the Former Member's Interest. Each Remaining Member shall notify the other Members in writing of his or her desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest.

7.5. Election to Purchase Less Than All of the Former Member's Interest. If the Company and the Remaining Members fail to purchase the entire remaining interest of the Former Member, pro rata, then the failure of a Member to purchase a pro rata share shall proportionately increase the share which may be purchased by the other Remaining Members.

7.6. Payment of Purchase Price. The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance

shall accrue interest at the current applicable federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation of the Company and each purchasing Remaining Member, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the Company or the respective purchasing Remaining Member, as applicable. Each such promissory note shall be in an original principal amount equal to the portion owed by the Company or the respective purchasing Remaining Member, as applicable. Any promissory note executed by any purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

7.7. Closing of Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article 7 shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

## ARTICLE 8.
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1. Books and Records. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

8.1.1. A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

8.1.2. A copy of the Articles, this Operating Agreement and any and all amendments thereto, and any and all resolutions adopted by the Managers or Members, as appropriate, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

8.1.3. Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

8.1.4. A copy of this Agreement and any and all amendments thereto, and any and all resolutions passed by the Members, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

8.1.5. Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

8.1.6. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

8.2. Reports. The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

8.3. Bank Accounts. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person.

8.4. Tax Matters for the Company. Linda Seeley is designated as "Tax Matters Partner" (as defined in Code section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 9.
## DISSOLUTION AND WINDING UP

9.1. Conditions of Dissolution. The Company shall dissolve upon the occurrence of any of the following events:

9.1.1. Upon the happening of any event of dissolution specified in the Articles;

9.1.2. Upon the entry of a decree of judicial dissolution pursuant to section 17351 of the Corporations Code;

9.1.3. Upon the vote of Members holding at least sixty-six and two-thirds percent (66.667%) of the Membership Interests;

9.1.4. The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or

9.1.5. The sale of all or substantially all of the assets of Company.

9.2. Winding Up. Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3. Order of Payment of Liabilities Upon Dissolution. After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4. Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article 10.

9.5. Certificates. The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE 10.
## INDEMNIFICATION

10.1. Indemnification of Agents. The Company shall indemnify any Member or Manager and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

## ARTICLE 11.
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1. Preexisting Relationship or Experience. He or she has a preexisting personal or business relationship with the Company or one or more of its officers, if applicable, or controlling persons, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own interests in connection with this investment.

11.2. No Advertising. He or she has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3. Investment Intent. He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

## ARTICLE 12.
## MISCELLANEOUS

12.1. Counsel to the Company. Counsel to the Company has been counsel to certain Members and/or certain Affiliates of Members in the past. The Company has initially selected Noland, Hamerly, Etienne & Hoss, A Professional Corporation ("Company Counsel") as legal counsel to the Company which has prepared this Agreement at its sole request. Each Member acknowledges that Company Counsel has not represented any Member in the preparation of this Agreement or given advice concerning the propriety of signing it. In the absence of a clear and explicit written agreement, Company Counsel owes no duties directly to any Member concerning this Agreement including, without limitation, its preparation, execution or rights arising from it. Each Member acknowledges that the interests of a Member may be different than or actually conflict with the interests of the Company or the interests of another Member. Each Member hereby consents to the representation of the Company by Company Counsel notwithstanding

such a conflict, and notwithstanding that Company Counsel may represent a Member in other legal matters. Each Member acknowledges that such Member has been advised that it should seek the advice of independent counsel of its choice concerning any question regarding the consequences of executing this Agreement. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, then each Member agrees that Company Counsel may represent either the Company or such Member in any such dispute or controversy to the extent permitted by the California Rules of Professional Conduct or similar rules in any other jurisdiction, and each Member hereby consents to such representation.

12.2. Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3. Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.4. Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.5. Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.8 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

12.6. Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this

Agreement shall be submitted to the American Arbitration Association for arbitration in Monterey County, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law. In addition, the arbitrator shall have no power or authority to award any punitive damages.

12.7. <u>Severability</u>. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.8. <u>Notices</u>. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

12.9. <u>Amendments</u>. All amendments to this Agreement will be in writing and signed by all of the Members.

12.10. <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.11. <u>Attorneys' Fees</u>. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including, without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from

the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorneys' fees shall include, without limitation, fees incurred in the following: (1) post judgment motions; (2) contempt proceedings, (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation; and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.12. Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.13. Consent of Spouse. Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have his or her spouse execute a consent substantially in the form attached to this Agreement.

IN WITNESS WHEREOF, all of the members of The Inn at Del Monte Beach, a California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS

[signature]
LINDA SEELEY

[signature]
NICK KANAAN

THE INN AT DEL MONTE BEACH
OPERATING AGREEMENT

EXHIBIT A

| Initial Name, Address and Taxpayer ID Number | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Linda Seeley<br>680 E Romie Lane<br>Salinas, CA 93901<br>[redacted] | $ 7,000 | 70% |
| Nick Kanaan<br>680 E Romie Lane<br>Salinas, CA 93901<br>[redacted] | $ 3,000 | 30% |

LINDA SEELEY

NICK KANAAN

CONSENT OF SPOUSE

I, the undersigned, certify that:

1. I am the spouse of a member who has signed the OPERATING AGREEMENT OF THE DEL MONTE BEACH INN DATED November 1, 2007.

2. I have read and approve the provisions of the OPERATING AGREEMENT OF THE INN AT DEL MONTE BEACH.

3. I agree to be bound by and accept the provisions of the OPERATING AGREEMENT OF THE INN AT DEL MONTE BEACH in lieu of all other interests I may have in such Agreement.

Dated: November 1, 2007

E. Kanaan

ELIZABETH KANAAN