# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NABIH "NICK" KANAAN, | Case No.: 5.21-cv-09591-PCP |
| Plaintiff, | |
| vs. | |
| NIZAR YAQUB, an individual, | |
| Defendant. | |

VIDEOCONFERENCE DEPOSITION

OF

NIZAR YAQUB

THURSDAY, APRIL 17, 2025
9:09 a.m. to 12:54 p.m.

REPORTED BY: Cynthia A. Kennedy, RPR, CSR
California CSR No. 10415

that.

**Q. And how did you guys meet?**

A. His wife was my patient.

**Q. And did you become friends at that time?**

A. Yes.

**Q. Did you remain friends throughout -- from the '70s through the present day?**

A. Yes.

**Q. Do you still talk to Mr. Kanaan?**

A. Personally, you know, I -- I talk to his children.

(Stenographic reporter clarification.)

A. I did not talk to Mr. Kanaan since 2019, personally, but I've been in contact with his children.

**Q. And what have your conversations with his children been about?**

A. It's social. Social contacts. Nothing more.

**Q. Did you ever talk to his children about anything to do with this lawsuit?**

A. No.

**Q. Are you familiar with -- strike that.**

**Do you currently own any businesses or have ownership interest in any businesses?**



A. I still have interest in the company called The Inn at Del Monte Beach, LLC, which operates as a DBA of Hotel 1110.

(Stenographic reporter clarification.)

A. The Inn at Del Monte Beach, LLC.

**Q. And what is your ownership interest in the inn?**

A. It still in flux. I don't know exactly how to answer that. It's a legal question. Still in contention.

**Q. What do you think your ownership interest is?**

A. I don't think what I think is important. I don't know -- as I sit down here, I don't know what exactly my interest is. I'm -- it is a legal litigation, and that will determine your answer.

**Q. Well, that's okay. I'm just asking what you think. I don't need the legal answer.**

MR. GALLAGHER: I think -- I'll object. Asked and answered. It also calls for a legal conclusion. But if you have an opinion, just an opinion, you can answer, Nick.

A. I don't know how to answer this. I mean, it's not -- I never give it a thought, so I don't think about it.



**Q. Do you think your ownership interest is greater than zero percent?**

A. Yes.

**Q. Do you think it's less than 100 percent?**

A. Questionable. I can't answer that question.

**Q. Are you the manager of the inn?**

A. Yes.

**Q. How long have you been the manager?**

A. I've been the manager since my -- since my late wife deceased, which would be 2011.

**Q. Do you remember about --**

A. My wife --

**Q. I'm sorry, go ahead.**

A. July 2011.

**Q. That's when you became the manager?**

A. Yes.

**Q. How did you become the manager?**

A. The manager that was in place has left employment, and Linda became ill and she asked me to -- to help taking the affairs of the hotel because she couldn't afford to have another manager. And somebody has to take care of certain things, and I stepped in.

**Q. So were you -- you were helping her and acting as manager prior to her passing?**



MR. GALLAGHER: Objection. Misstates his testimony. But go ahead.

A. Not more than husband-and-wife conversations, but she was the active manager till the day she died.

MS. GORDON: If I could introduce the first exhibit, please.

MR. GALLAGHER: The exhibits you sent us do not have any numbers on them or letters, so you might want to explain what it is.

MS. GORDON: Yes.

MR. GALLAGHER: Or specifically the --

MS. GORDON: Yeah, we're just going to do it by title.

MR. GALLAGHER: Okay.

MS. GORDON: I'll make sure I describe everything so you guys can find it before we introduce it as an exhibit.

So the first exhibit will be the Operating Agreement for The Inn at Del Monte Beach, that document title.

MR. GALLAGHER: Okay.

MS. GORDON: All right. Thank you.

MR. GALLAGHER: This is exhibit what number?

MS. GORDON: This will be Exhibit 1.
MR. GALLAGHER: Okay.
**Q. Do you recognize this document?**
(Whereupon Exhibit 1, to be later marked, was referenced.)
A. Yes.
**Q. And you've seen it before?**
A. Yes.
**Q. Do you recall when the first time is that you saw this document?**
A. 2018 was the first time I saw this document.
**Q. 2018?**
A. 2018, yes.
**Q. And you said that you became the manager of the LLC in July 2011?**
A. That's correct.
**Q. What document were you using to refer to while you managed the LLC between 2011 and 2018 when you first saw this document?**
A. No documents.
**Q. How did you know what the rules were for the LLC to follow?**
A. I did not. There was no rules other than the deed to the operation as it was transmitted to



me -- or given to me by Linda. There was no written procedures, anything in that operation.
**Q. Before Linda passed, she'd never handed you or otherwise showed you a copy of this document?**
A. No.
**Q. And what were the circumstances for you first seeing this document in 2018?**
A. We made an application for a liquor license with the ABC, and the existence of this document became an issue with the ABC. And I asked them to give me copy of that document, and they give me a copy.
**Q. Let's back up to when Linda was ill and asked for some assistance in managing the LLC.**
**Do you remember about what time that was when you first started helping her?**
A. It would be three to four months before her passing.
**Q. And what sort of things would she have you help her with? Relevant to managing the LLC, not elsewhere.**
A. She had the final say and final execution, but if she needs help depositing money in the bank or dealing with an employee or talking with vendor or things of that sort, day-to-day operation. I was --



because she was ill, sometimes she doesn't come all the time, I carried this -- these tasks.
**Q. When the management of the LLC was purportedly transferred from Linda to you upon her passing, did she also transfer her ownership to you at that time?**
A. Yes.
**Q. And what documents are you aware of that exist to show that she transferred her interest in the LLC to you?**
A. What time frame are you talking? At what time?
**Q. Whenever she transferred the ownership of -- her ownership interest to you in the LLC.**
A. I don't think she give me any documents. I mean, you have to understand, this is a small -- it's not a big business. It's a small -- very, very small operation running 17-room hotel. It's not -- there is no documents. There's no files. Everything we have is in the -- you know, in a day-to-day operation, at the time we have two or three employees and that's it.
**Q. So would you say that the LLC is, you know, just a small company owned among friends?**
A. Family, yes.
**Q. Do you consider Mr. Kanaan to be family?**



A. No.
**Q. Did you at the time the LLC was formed?**
A. And, again, I'm sorry. I missed the question.
**Q. Did you consider Mr. Kanaan to be a close-enough relation to be family at the time the LLC was formed?**
A. As a close friend, yes.
**Q. Were you involved at all in the formation of the LLC?**
A. No.
**Q. Do you know who owned the LLC when it was formed?**
A. It was Linda and Nick Kanaan, Nabih Kanaan.
**Q. And did Linda talk about the formation of the business with you at all?**
A. Just normal family discussions, not more.
**Q. Why were you not part of the formation of the LLC?**
A. Well, that LLC was the only business that was not medically related. And at the time, I still had two or three other medical companies which involved other physicians, not in ownership but in -- in structure, and I thought I won't be of any help for them to do that. So I did not -- if Linda was there,

**the first time you saw it?**
A. Because I didn't have any paperwork about the company before 2018. I have no reason to keep anything. And when the controversy arose with Mr. Kanaan and the ABC, this is when these paperwork start to appear.
**Q. Did you ever make any requests of the Secretary of State of California for any documents about the LLC after 2011?**
A. Yes, I did.
**Q. And when was that?**
A. I do not recall exactly, but I did just to see if there's anything in the company, and there's none, except the biannual -- biannual reporting.
**Q. Do you recall when the first biannual report after Linda's passing was filed with the Secretary of State of California?**
A. After she passed away is what you said?
**Q. Yes.**
A. Either 2011 or 2012, one or the other. Usually in August we filed. We had to file August.
**Q. And how did you know that that document needed to be filed?**
A. I got a notice from the Secretary of State.
**Q. Moving on to the ABC, can you tell me what**



**the ABC stands for?**
A. Alcohol and Beverage something of California.
MR. GALLAGHER: Control.
A. Control. Alcohol and Beverage Control.
**Q. And what documents did you need to file with the ABC?**
A. I don't understand. I did not file the original documents, so I don't know what your question is.
**Q. Not the original documents, just what documents at all did you need to file with the ABC for the LLC?**
MR. GALLAGHER: I'll object. Just vague as to time, the time period we're talking about.
MS. GORDON: Well, from when -- sorry. When he took over in 2011 through present.
MR. GALLAGHER: Okay.
A. What was required -- when we changed the type of liquor license, what was required only just file an application.
**Q. And do you recall when that was?**
A. 2017, I think I filed the application for the first time.
**Q. And on that application, do you recall what**



**information was required about ownership of the LLC?**
A. Yes.
**Q. What did you need to tell them about ownership?**
A. Who owns the -- who owns the company and who all the members are, and if any other member owns more than 20 percent of the company.
**Q. And do you know why that 20 percent figure is significant?**
A. I have no idea. That's their rules.
**Q. So is it your understanding that to apply for the liquor license, they would need to know whether any person or entity had more than a 20 percent ownership in the LLC?**
A. I think they need to know all members, but they need signature of somebody who owns more than 20 percent on the application.
**Q. Did you have any involvement in assisting Linda or Mr. Kanaan with the LLC prior to 2011?**
A. Help in what capacity?
**Q. As you said, when Linda had gotten ill, you'd help her sometimes with operations work and things that needed to be done for the LLC.**
**Did you do that at any time prior to 2011?**
A. No. Other than being her husband and part



of her family. You know, the knowledge and if there is decisions to be made, she'd run it by me as a husband and wife, but not as an owner.
**Q. Are you aware of any other documents pertaining to the LLC other than the operating agreement and the options notice that we've looked at so far?**
A. What time frame?
**Q. From the inception of the LLC when it was formed in 2007.**
MR. GALLAGHER: I'm going to object as just vague and ambiguous. You're talking about -- what kind of document? Are you talking about legal documents or -- I mean, correspondence? I'm sorry, I didn't -- I didn't understand the question.
MS. GORDON: Yeah, that's okay. I can clarify.
**Q. Are you aware of any other documents pertaining to the operations of the LLC, that would have been required either under the operating agreement or under California law, existing?**
A. I'm not sure that California law require you to have an operating agreement or have any things in writing for small LLC like this to exist. I found out later that certain entities require to have an

operating agreement. One of them is the ABC. So we filed an operating agreement with the application to obtain a new ABC license, liquor license.

**Q. After Linda passed away and you assumed the role of manager, what actions did you take to look for any other documents that may have been required or recommended for you to have in your capacity as manager?**

A. I did not. I didn't know there was any.

**Q. Did you look for any?**

A. No.

**Q. After Linda passed away, did you have frequent communication with Mr. Kanaan?**

A. Yes.

**Q. Do you recall about how frequently you guys would speak?**

A. At least once a week.

**Q. And did you speak about the LLC?**

A. All the time.

**Q. Did you communicate to Mr. Kanaan after Linda passed away that you were taking over as manager?**

MR. GALLAGHER: Objection. Asked and answered. But you can go ahead.

A. I didn't see a need for that. I don't



think I told him, you know, Mr. Kanaan, or Nabih, you know, that I'm now the manager. It was a de facto and he knows. And he comes to that hotel at least every two months, at least four or five times a year. So I did not say -- I do not recall a conversation to say, Mr. Kanaan, or Nabih, do you know that I am the manager now? I did not.

**Q. Did you ever ask Mr. Kanaan if there were any documents pertaining to the LLC that existed after Linda passed away?**

A. No.

**Q. Did you know what Mr. Kanaan's ownership interest in the LLC was at the time that Linda passed away?**

A. Yes.

**Q. What was your understanding of what his ownership percentage was?**

A. Eight percent.

**Q. Was that the original ownership percentage that Mr. Kanaan had in the operating agreement?**

A. I didn't know there was an operating agreement, so I don't know, you know, to refer to that as a reference.

**Q. How did you come to think that Mr. Kanaan's ownership percentage was eight percent in 2011?**



MR. GALLAGHER: I'll object. It calls for a legal conclusion. But go ahead and answer if you can, if you understand the question.

A. Because in 2009, there was a -- a crisis in completing the hotel, and Linda has called him to come, I think, in September in 2009, third week in September. And she laid out for him that it's impossible -- we run out of all options. It's impossible to finish the project. The bank has informed us they're going to foreclose. The City will cancel the permit because it has been over two years in construction. And urgent need for funds has to be raised right away, and she suggested that she pay 700,000 and he pay $300,000. In that meeting, Mr. Kanaan became, for the first time I saw him (indiscernible) very aggressively ugly and combatant, and that meeting did not end well.

Then the next morning, Linda called for another meeting and told him the bank foreclosed, we're all liable personally for the outstanding, and she suggested that we sell the hotel as is. And Mr. Kanaan agreed to that. So she called -- that day she called the broker who sold us the building and asked him if he could help find -- he's a specialized broker in hotels, if he could find a buyer to buy it



as is and assume all liabilities.

And he came back three weeks later. He said he could not find any -- it was a bad market, and the hotel was (indiscernible) --

(Stenographic reporter clarification.)

A. And could not find anybody interested in doing something like that, and he could not help us sell the building.

Then Linda called Mr. Kanaan again in October and told him what the broker said, and, again, Mr. Kanaan was very adamant not to participate in any further capital contribution. Then she said, Well, I have to get in -- next in my retirement account to provide the money. And in that case, she shows him some calculation, that his interest would be decreased to eight percent. And that's what I -- that's how I know.

**Q. So you were present at the October 2009 meeting?**

A. I was present in September and October, both.

**Q. And so how did the October 2009 meeting conclude with Mr. Kanaan?**

A. It conclude that as long as he doesn't have to pay any further capital, he's okay with anything

else that goes on. It's fine. If his capital decreased, so be it.
**Q. Do you have the document that you say exists -- existed in 2009 where Linda broke down the calculations that would reduce Mr. Kanaan's ownership percentage to eight percent?**
A. No, I do not.
**Q. Do you know what happened to that document?**
A. I don't think it was a document. It was probably on a napkin or something. I do not -- I do not have access to any document like that.
**Q. To the best of your knowledge, did Mr. Kanaan ever sign any document acknowledging that his interest in the LLC would be reduced to eight percent?**
A. I'm not aware that either Mr. Kanaan or Linda have ever signed anything to each other. It was a -- it was oral agreements, handshake. I don't think it was -- it was their way of dealing with each other in business by signing documents.
**Q. Are you aware of the existence of any document that would demonstrate a vote or other evidence of a majority approval from Linda for the additional capital contributions that you say were made?**



A. I'm not aware of any.
**Q. When was your next meeting -- strike that.**
**When was the next meeting between Linda and Mr. Kanaan after October 2009?**
A. I believe they kept meeting the same way, the -- if I recall correctly, his visits became less frequent, but he came at least three or four times a year. And Linda was determined to keep the relationship amicable and continued that way.
**Q. Are you aware of any documents that exist that gave notice to Mr. Kanaan of these meetings before they happened?**
A. No documents, no. I'm not aware of any documents.
**Q. Were you present at all of the meetings between Linda and Mr. Kanaan?**
A. In these two meetings?
**Q. Were you present for all of the meetings between Linda and Mr. Kanaan for the LLC?**
A. For the most part, but not always because I was a busy physician. And you could meet -- it was all informal. There was nothing -- I don't remember there was any formal meeting ever between Linda and Kanaan or between me and Mr. Kanaan.
**Q. Did Mr. Kanaan ever acknowledge to you that**



**he accepted that his ownership percentage in the LLC was reduced to eight percent?**
A. Yes. I was there. He said, It's okay with me. He said -- if I remember the call. It's okay with me -- as long as I don't have to pay any further, if my -- my percentage decreased, so be it. I'm fine with that. He said, I'm fine with that.
**Q. What specifically did he say he was fine with?**
A. With that. That what I just said.
**Q. I guess my question is, he said he was fine -- according to you, he said he was fine with his ownership position being reduced to eight percent.**
**As alternative to what?**
A. Whatever his percentage was. I said I did not see operating agreement. It's my understanding, of just recollection, was 30 percent.
**Q. Did Linda ever reference the operating agreement during all of these meetings that you attended with her and Mr. Kanaan?**
A. Never.
**Q. Did Mr. Kanaan ever reference the operating agreement in all these meetings you were at with them?**
A. Never.
**Q. Sorry. Give me one second. I'm just**



**getting my next exhibit.**
MS. GORDON: If we could look at the next exhibit, which would be Yaqub 0001, it says, "Minutes to Memorialize Prior Action Taken." And that will be Exhibit 3.
(Whereupon Exhibit 3, to be later marked, was referenced.)
MR. GALLAGHER: It's the one right before the last one we looked at.
MS. GORDON: Yes.
MR. GALLAGHER: It's at the bottom.
THE WITNESS: Just a minute.
MR. GALLAGHER: Sure.
It's a one-page document.
MS. GORDON: Yes.
THE WITNESS: Okay. I have it.
MS. GORDON: Great.
MR. GALLAGHER: I'm sorry. Could I just have one second?
MS. GORDON: Yes.
MR. GALLAGHER: Okay. That's fine.
**Q. Are you familiar with this document?**
A. Yes.
**Q. So on the second paragraph there, where it says, "Request having been made in April 2008," what**

**is your recollection of the request made in April 2008 for a capital contribution?**

A. Very vague recollection, I think. I over -- I was not involved in that operation at all. I overheard Linda that we running -- we're going over budget with the building, and she asked me if I know somebody to help lending us more money, and I suggested that she might contact the wife of one of my employees who was interested in real estate -- these the things I recall, nothing specific.

MR. GALLAGHER: I'm sorry, could you -- what's -- could you repeat the question? I'm not sure if he understands it.

MS. GORDON: Yeah. So he, you know, just testified about being present for the meetings in September and October 2009 where a capital contribution call was alleged to have been made. I would like to get his recollection in detail about the capital call request alleged to have been made here in April 2008.

MR. GALLAGHER: Okay. Thank you.

A. Should I -- the answer? I thought I answered.

My recollection is nothing formal was -- I recollect that Linda was -- start to say that we do



not have enough capital to finish the project. We'll need more capital. She asked me if I have an ideas how to get more capital, and -- but nothing formal or anything more than that.

**Q. And this was just Linda asking you?**

A. Yes.

**Q. So did you contribute capital to the LLC at that time?**

MR. GALLAGHER: At what time are we talking about?

MS. GORDON: In April 2008.

A. No. The only time I -- it was contributed from our -- from our savings or pension in October, if I recall. She asked me if I agree, and I reluctantly did.

**Q. And this was October of what year?**

A. 2009.

**Q. 2009. So you're aware of no formal requests made to Mr. Kanaan for any additional capital contribution?**

MR. GALLAGHER: Objection as to vague, and ambiguous as to "formal."

**Q. Apologies. So you are not aware of any written requests for capital contribution having been made to Mr. Kanaan?**



A. I'm not aware of any written, no. I'm not aware --

(Stenographic reporter clarification.)

A. I'm not aware of anything written. I'm not aware of anything written.

MR. GALLAGHER: Okay. You've answered the question, yeah.

A. No.

**Q. Did Linda make any additional capital contributions in 2008?**

A. I don't know. I don't believe so, but I don't know.

**Q. So you've testified that you did not become a -- apologies.**

**You testified that you did not become a member of the LLC until July 2011 when Linda passed away, correct?**

A. Or shortly before, you know -- yeah, around that time, yes.

**Q. What's the date on this Exhibit 3 that we're looking at, when you signed it?**

A. November 15, 2018.

**Q. And you state in this document that you made a capital contribution as a member.**

MR. GALLAGHER: Wait one second.



Objection. Is that what it says? Let's see.

Okay. Go ahead. You can answer the question.

A. And the question again? I'm sorry, it's too many...

**Q. This document you signed states that you made a contribution to the LLC as a member; is that correct?**

MR. GALLAGHER: Objection.

A. Yes.

MR. GALLAGHER: Misstates the document slightly.

A. As I mentioned before, all what I know that Linda used our community money, our retirement money, to finish the project. And that was my contribution.

**Q. Prior to 2011 -- I'm sorry, prior to July 2011, did Linda execute any documents with you transferring any membership interest to you?**

A. I'm not aware of, no.

**Q. Did you draft this document, Exhibit 3 here?**

A. No.

**Q. Who did?**

A. My attorney.

**Q. And who is your attorney?**

A. Mr. Murray.
**Q. Did he explain this document to you before you signed it?**
A. Yes.
**Q. And what was the explanation that he provided to you?**
MR. GALLAGHER: Objection. Attorney-client privilege.
**Q. Strike that.**
**What was your understanding of what this document meant before you signed it?**
A. My understanding of what it meant?
**Q. Yes.**
A. It meant that Linda and I contributed -- like I mentioned -- like I answered before, Linda and I had contributed additional money in 2009, and that changed the percentage of the capital percentage between the two partners, and that's the new percentage as of 2009 on. That's what I understand it's supposed to mean, as explained to me.
MS. GORDON: All right. It's been about an hour. Would everyone be all right with a brief break and then we'll come back?
MR. GALLAGHER: Sure. How long do you want?



MS. GORDON: Could we do 10 minutes?
MR. GALLAGHER: Sure, yeah.
MS. GORDON: Great. All right. We'll see you guys back in 10.
(Whereupon a recess was taken 10:07 through 10:16.)
MS. GORDON: Let's get the next exhibit. For Exhibit 4, if we could please look at the document titled Yaqub 0013-0015. It's the letter from William Murray dated June 1st, 2018.
(Whereupon Exhibit 4, to be later marked, was referenced.)
MR. GALLAGHER: It's a two-page -- actually three-page document?
MS. GORDON: Yes. Although I think that third page is inadvertent.
MR. GALLAGHER: Yeah, that's just the copy. Okay. It should have been right next to that one.
THE WITNESS: What's the date?
MR. GALLAGHER: June 1st, 2018.
MS. GORDON: Correct.
THE WITNESS: Yes.
**Q. Okay. And do you recognize this document?**
A. Yes.
**Q. What is this?**



A. This is a letter from my attorney, Mr. Murray, to Mr. Kanaan regarding the controversy about Mr. Kanaan -- issues he raised in 2018.
**Q. If you could please look at the fourth paragraph there that states, "Then apparently in or about 2010, a request was made that you proportionately contribute towards expenses," et cetera.**
**Do you see --**
A. Yes.
**Q. -- that?**
A. Yes.
**Q. Did you review this letter before it was sent to Mr. Kanaan?**
A. Yes.
**Q. What was the capital call that was made in 2010?**
A. My recollection is that's the amount that was needed to finish the project, and that was the amount was called for. Or closer to that amount. I mean, I remember 7/3, but...
**Q. And do you recall when in 2010 that request was made?**
A. It was in -- in September -- as I mentioned before, the two meetings that -- that generated that



request.
**Q. Which two meetings were those?**
A. The meeting September 2009 and then in October 2009.
**Q. And you were present for all of these meetings?**
A. In these two meetings, yes. I was asked to be present.
**Q. So in the minutes to memorialize the prior action taken, Exhibit 3 that we just looked at, you signed a document that states that requests were made in April 2008 and in October 2009.**
**And then in Exhibit --**
A. Yes.
**Q. -- 4 that we're looking at you now, you reviewed this letter and it was -- you were copied on it, stating that there was a capital call request made to Mr. Kanaan in 2010.**
A. That's wrong. It should be 2009.
**Q. Why did you not correct this before it was sent to Mr. Kanaan?**
A. I missed it. It's -- it's a long time ago, and I read the letter for other contents. The dates were close.
**Q. Was there notice -- written notice of any**

**capital call in 2010 that was sent to Mr. Kanaan?**
A. No.
**Q. Was there ever a written notice for a capital call sent to Mr. Kanaan at any time during the --**
A. I'm not --
**Q. -- LLC's existence?**
A. I'm not aware of.
**Q. Was there ever a written notice sent to Mr. Kanaan prior to this June 1st, 2008, letter stating that his membership interest was being reduced to eight percent?**
A. No.
**Q. In any of your weekly communications with Mr. Kanaan, did you ever communicate to him that his membership interest was going to be reduced to eight percent or had been reduced to eight percent?**
A. At what time?
**Q. At any point.**
A. Yes.
**Q. And when was that?**
A. All the time. All the time. Every time anything comes -- like when we ask for distribution in 2015, '16, I told him we're going to distribute eight to 92. And in completing the tax returns, I told him



that they ask us do the ownership, and I -- there's one page require ownership, and I told him I'm going to put 92 percent, and he agreed to that.
He understood that he has eight percent all along. The first time that ever come -- that changed is in 2018 or 2017 when another capital needs arose again.
**Q. And what was the circumstances for the need of additional capital at that time in 2017?**
A. In 2017, we have two, three issues at the same time, that I think I run by Mr. Murray, is the City has concluded that our payment used for the rooftop was not really authorized and need to be reexamined, and they ask us to close it, which we have to, which really affected the operation negatively to huge extent, because that's the best thing the hotel has, that rooftop. And we have an audit from the EDD about method of payment for employees, and they were asking for about -- over $100,000 in taxes. And there was -- the City indicated if we need -- need to update our equipment, and that require other additional capital.
So -- and it all happened at the same times.
So we needed -- at the time we estimated



that we needed about $350,000.
**Q. And did you communicate that to Mr. Kanaan?**
A. Yes. The letter communicated that to him too.
**Q. I'm sorry, could you repeat that answer?**
A. Yes. Yes, I did and -- and I get the same answer. He's not interested in contributing anything.
**Q. How did you communicate that to him?**
A. The phone.
**Q. Did you ever send him any documents showing proof that that was the amount needed for the capital contribution?**
A. No.
**Q. Did you ever send him a written request for capital contribution for that amount?**
A. No.
**Q. Were you able to get those funds?**
A. It took us two years, and things work in our favor. The audit was determined in our favor. We didn't have to spend that much money. And the City have softened their position and authorized that we -- during the two, three years after -- it delayed things, but we were able without having any additional funds, at a later time. It took two, three years to finish.



**Q. Is it your position that Mr. Kanaan's ownership percentage was reduced beneath eight percent at that time?**
MR. GALLAGHER: Objection. Calls for a legal conclusion. But you can answer what your understanding was.
A. Those -- I was advised by my attorney that the position I should take, that he owns nothing. Because that's the only way to save the company, he said.
**Q. And at what point in time are you alleging that Mr. Kanaan's ownership position was zero?**
A. That was -- when we submitted the operating agreement to the ABC, I have legal advice to say don't put him to owning anything; otherwise, it's going to create problems. You have a duty to the LLC, to save the LLC, because if you lost your liquor license, you really -- great damage. And the easiest thing to do and the best thing to do to save the company is to -- to let him go.
MS. GORDON: If we could look next at the document titled Yaqub 0006 through 0011 titled the First Amended Operating Agreement. And that will be Exhibit 5.
(Whereupon Exhibit 5, to be

later marked, was referenced.)
THE WITNESS: Is that the one?
MR. GALLAGHER: Yes.
A. Yes.
**Q. Do you recognize this document?**
A. Yes.
**Q. And is this the same document that you submitted to the ABC for the liquor license application?**
A. Yes.
**Q. If we could again look at Exhibit 4, the June 1st letter.**
**The last sentence of paragraph 4 says -- the last two sentences say, "As a result of your failure to make any contribution, your interest was reduced to eight percent. Ms. Seeley provided you notice of that change to which you did not object."**
**Have you ever seen a copy of that purported notice?**
A. No.
**Q. In the course of your investigation and diligence for this lawsuit, did you find a copy of that notice?**
A. No.
MR. GALLAGHER: I'm going to object. It



assumes facts not in evidence that the notice was in writing, if there was.
**Q. The next paragraph there reads, "Subsequently there was apparently further agreement and/or action taken that reduced your interest in the LLC to zero, although frankly we have been unable to locate the underlying documentation of that agreement and/or event."**
**Was it an agreement or an event that purportedly reduced Mr. Kanaan's ownership percentage to zero?**
MR. GALLAGHER: Objection.
A. I under --
MR. GALLAGHER: Calls for a legal conclusion. But go ahead and answer.
A. I understood it was an event, which I mentioned, which I testified for, that led to an agreement she agreed to and he kept agreeing to for seven years.
**Q. Kept agreeing to what?**
A. Agreement -- he kept agreeing to that agreement -- not contesting that agreement for over seven years.
MR. GALLAGHER: I think there may be some confusion as to what agreement we're talking about



here.
THE WITNESS: That he owns eight percent.
**Q. I'm referring --**
A. Or that (indiscernible cross talk) --
**Q. -- to an event or agreement that is referenced in the letter saying that it reduced his ownership to zero.**
A. I do not -- let me read that again.
Are you talking about the last paragraph, "If you disagree"?
**Q. No. The paragraph just before that one.**
A. "Reduced your interest in the LLC to zero."
MR. GALLAGHER: Can you restate the question, please?
MS. GORDON: Sure.
**Q. So was it an agreement or an event that reduced Mr. Kanaan's ownership percentage in the LLC to zero?**
A. It doesn't say when, so I really don't know. I have no -- nothing to add than I testified already. We did -- so I -- it doesn't say the date in here or any of that, so I really don't know. I testified to this what I know. I have nothing else to add to that.
**Q. So I'm sorry, just for my own**



**clarification, when was Mr. Kanaan's ownership percentage reduced to zero? What date?**
A. I don't know.
**Q. Was any written document sent to Mr. Kanaan notifying him that his ownership interest was now zero?**
A. I'm not aware of any.
**Q. I'm sorry, can you remind me --**
MS. GORDON: Sorry. Court Reporter, could you read back the prior dates for when the most recent capital call was?
THE WITNESS: It was in 2017.
MR. GALLAGHER: She's not asking you.
**Q. It was 2017?**
A. No, I'm sorry. I'm sorry. I thought you were asking me.
**Q. Yeah, actually that would be easier. Sorry, Mr. Kanaan (sic).**
**What was the last capital call that was made in the LLC?**
A. It wasn't formal capital call. It was information to other member that we need $350,000; we expect him to pay his share of it. And that was in 2017 after the events I testified for before.
**Q. And when you say the "other members," who**

**are you referring to?**
A. Mr. Kanaan.
**Q. Were there any other members of the LLC?**
A. No.
MR. GALLAGHER: I'm sorry, do you mean besides Mr. Yaqub?
MS. GORDON: Yes.
**Q. Were there more than two?**
A. No.
**Q. Okay. If we could refer to Exhibit 5, the first amended operating agreement there.**
**Is that correct that the effective date is December 1st, 2011?**
A. That's what it says.
**Q. And is it correct to say that this amended operating agreement, you list yourself as the sole member of the LLC?**
A. Yes.
**Q. And what is the date on which you signed this amended operating agreement?**
A. December 1st, 2018.
**Q. Why was this operating agreement backdated to list you as the sole member from 2011 if Mr. Kanaan's ownership percentage wasn't allegedly reduced to zero until after 2017?**



A. I did not say that it did not reduce to zero until 2017. I mean, that's -- I don't know -- that was the legal advice I received to do it to save the company, and I agreed -- I followed the legal advice.
**Q. When you say "save the company," what do you mean by that?**
A. I mean, we're already -- we're 15 months behind getting a liquor license. And, I mean, without the liquor license, the company would bankrupt in few months. We were 15 months behind.
MR. GALLAGHER: You've answered the question.
**Q. And if Mr. Kanaan's ownership percentage was greater than 20 percent, you would have required his signature to obtain that liquor license; is that correct?**
A. Yes.
**Q. Did you ever ask Mr. Kanaan if he would have signed off on the application for the liquor license?**
A. Many times.
**Q. And what did --**
A. (Indiscernible cross talk.)
**Q. -- he say?**



A. He refused. He said he will not sign anything unless we declare that he has 30 percent, and he will think about it.
**Q. When did you ask him to sign off on the application for the liquor license?**
A. Actually we -- immediately after the ABC notified us we need his signature, we ask him. And my attorney asked him, and we asked him through his other attorney.
**Q. And when was that?**
A. Well, between 2017 when we have the application. I don't know the exact dates, but there was some correspondence between Mr. Murray and the other attorney and -- between 2017 when we have the application till the end of 2018 when we got -- finally got the license.
**Q. Why would you ask for his signature in 2017 if his ownership interest was only eight percent at that time?**
A. Because the ABC refused to accept that, refused to accept -- without his signature, that his interest was reduced to eight.
**Q. Why did they refuse to accept it?**
A. That's their rules. I don't know. They said if -- he has to sign that memorandum. We cannot



-- that's their -- that's their ruling, accept -- to accept that he reduced his ownership to eight percent, he has to sign that. And other procedure has to be made that he assign -- assigned that to -- to that fact. So they not accept that first memorandum we sent them.
**Q. When you say "first memorandum," what document are you referring to?**
A. Referring to the document that's exhibit -- which we informed the ABC that he has eight percent interest. We submitted that to the ABC, and the ABC did not accept our -- our -- our documentation.
**Q. Sorry. I'm just trying to find the document that you're referring to.**
MR. GALLAGHER: Exhibit 3?
**Q. Is there a document from the ABC that says that they rejected your application?**
A. I'm not sure. I don't recall. I -- I -- but they did not issue the -- I know they did not issue the license.
**Q. Do you recall when you submitted the application?**
A. We started the application 2017.
MS. GORDON: If we could next open the exhibit titled Amended Complaint Kanaan, and that will

be Exhibit 6.
(Whereupon Exhibit 6, to be later marked, was referenced.)
THE WITNESS: This one?
MR. GALLAGHER: Yes.
**Q. Oh, I apologize. It looks like the exhibits didn't come through. It's just the Amended Complaint itself.**
MS. GORDON: Charles, do you have a copy of -- or can I just circulate the exhibit? I'm looking at Exhibit C to the First Amended Complaint.
MR. GALLAGHER: Yeah, I have -- I have a copy here with me. Just one copy. I'm sorry. Which exhibit on there are you looking for?
MS. GORDON: It's Exhibit C to the First Amended Complaint. It's got the amended operating agreement listed first, then a couple documents thereafter.
MR. GALLAGHER: Exhibit A... Yes, I see it has minutes to memorialize prior action taken, and then a letter to the Department of Alcohol and Beverage Control. Yeah, I have those --
MS. GORDON: Okay. Great.
MR. GALLAGHER: -- documents.
MS. GORDON: Cindie, do you have an email



address so I send this to you as well?
MR. GALLAGHER: I'm going to make a quick copy so that we have both copies.
MS. GORDON: Yeah, we can go off the record for a minute while I just get this circulated.
MR. GALLAGHER: Sure. Be right back.
(Pause in proceedings.)
BY MS. GORDON:
**Q. If we could just take a look at Exhibit C, please.**
THE WITNESS: These two documents?
MR. GALLAGHER: I'm not sure. Jennifer, ours don't -- at least my copy of the Complaint didn't have -- didn't have an indication of A, B, C, or D. If you could just name the document --
MS. GORDON: Yes.
MR. GALLAGHER: -- or describe the document and we'll know.
MS. GORDON: So the document that I'm looking at is page 8 of Exhibit C, which is the letter to the Department of Alcoholic Beverage Control.
MR. GALLAGHER: Got it. Do you see that, Nick?
THE WITNESS: Yes.
MR. GALLAGHER: Okay.



**Q. Okay. So that second paragraph there says, "Pursuant to the request for clarification made by you," being the ABC, "please be advised that Dr. Nizar Yaqub is the owner of a 92 percent of the membership interests of The Inn at Del Monte Beach," et cetera.**
**And did you draft this document?**
A. No.
**Q. Who drafted this?**
A. My attorney.
**Q. And is that your signature on the document?**
A. Yes.
**Q. And did you review it before you signed it?**
A. Yes.
**Q. Okay. And then if we could please look at page 10 of that same exhibit, titled Limited Liability Company Questionnaire.**
A. Yes.
**Q. So if you'll notice towards the middle of the page there, it has the operating agreement date as November 30th, 2007. And then on that same line it says, "Last Amendment Date, January 2011."**
**What amendment was made in January 2011 to the operating agreement?**
A. In my mind when I fill this, I -- I refer to Mr. Murray, a new operating agreement drafted.



**Q. Is that the same as the first amended operating agreement that we looked at earlier as Exhibit 5?**
A. Yes.
**Q. The date on that first amended operating agreement is December 1st, 2011; is that correct?**
A. It says -- it says 1st day of December, 2011, yes.
**Q. Right. So on this Exhibit 6, the limited liability company questionnaire page, I want to know what was amendment to the operating agreement that occurred in January 2011?**
MR. GALLAGHER: Asked and answered, but go ahead.
A. That's the only -- that's the only change I'm aware of.
**Q. Did you review this document before it was submitted?**
A. Submitted to whom?
MR. GALLAGHER: This document, talking about the limited liability questionnaire?
MS. GORDON: Correct, yes.
**Q. Before this document was submitted to the ABC, did you review it?**
A. I maybe reviewed it, but probably have

Mr. Murray fill it out.
Q. Is that your signature on the bottom?
A. Yes.
Q. Okay. And in number 18 on this sheet where it says, "List All Members," do you see that towards the bottom third of the page there?
A. Yes.
Q. It says, "Nizar Yaqub, 92 percent, and Nabih Kanaan, eight percent"; is that correct?
A. Yes.
Q. And it says the effective date of that change is December 1st, 2011; is that correct?
A. That's what it says.
Q. Then why, when the first amended operating agreement was effective that same date, December 1st, 2011, do you list yourself as the sole member?
A. That was the legal advice --
MR. GALLAGHER: I'm sorry, where does it... I don't see where it states "sole member."
MS. GORDON: The first amended operating agreement.
MR. GALLAGHER: Oh, okay. I see what you're saying. Okay.
A. This is done --
MS. GORDON: It's also executed on



December 1st, 2011. I'm sorry, effective as of December 1st, 2011.
A. This was done with the consultation of my attorney, and I -- the dates are close enough. He knows about what legally is more valid, and I followed his advice.
Q. So you testified that Mr. Kanaan's ownership percentage was reduced to zero effective December 1st, 2011, when the new -- the first amended operating agreement became effective; is that correct?
MR. GALLAGHER: Objection. Misstates his testimony. You can answer.
A. I -- as I testified many times, the change of percentages were effective the way I testified about it before. It was a gentleman agreement that he would own eight percent, which he did not object to. The ABC did not accept that agreement, and the attorney advised me that the only way to get the liquor license is to get him out of the picture. And that's what I did.
Q. If we could refer again to Exhibit 6, that same last page, with the limited liability company questionnaire, there's a note in the box where it says "Manager Printed Name." It has your name, Nizar Yaqub, in the middle of the page.



What does that printed note say?
MR. GALLAGHER: I'm sorry, what -- where are we looking right now?
MS. GORDON: It's the --
MR. GALLAGHER: I got it. Never mind. The limited liability questionnaire?
MS. GORDON: Yes. The middle of the page, there's a written note next to Mr. Yaqub's name.
MR. GALLAGHER: Got it. Thank you.
Q. Did you write that note, Mr. Yaqub?
A. No. That's not my handwriting.
Q. Do you know who may have written that?
A. No.
Q. Did you print your name at the bottom of the page?
A. Don't recall. Probably.
Q. If we could scroll up a bit on this same exhibit to the letter that you sent to the ABC. What is the date on that letter?
MR. GALLAGHER: Yes.
A. December 5, 2018.
Q. So as of -- at least as late as December 5th, 2018, according to you, Mr. Kanaan still had an eight percent interest in the LLC; is that correct?
A. Yes.



Q. So Mr. Kanaan's eight percent interest would have had to have been reduced to the zero, as you claim, at some point after December 5th, 2018, correct?
A. No. I didn't say that.
Q. Are you stating that Mr. Kanaan's eight percent interest was reduced to zero prior to December 5th, 2018?
A. That's a legal opinion. I have attorneys to consult, and they -- they taking care of that.
MR. GALLAGHER: And it calls for a legal conclusion, but you can ask him as to his understanding.
A. I -- I explained everything I know about progressive ownership. What happened legally and what was necessary to protect the company and keep in business, that's a legal issues.
Q. Yes. And I'm -- what I'm questioning is, in this letter that you reviewed and signed, that was sent to the ABC to obtain the liquor license on December 5th, 2018, you state that it was your understanding that Mr. Kanaan still held an eight percent ownership interest in the LLC.
But I'm asking (indiscernible cross talk) --

A. That's what it states. That's what the letter states, yes.

**Q. Correct. So what I'm asking is, when then after December 5th, 2018, was Mr. Kanaan's ownership reduced to zero, as you claim?**

MR. GALLAGHER: Objection. Calls for a legal conclusion, but you can answer.

A. I never said after or before. I mean, it is -- it is the attorneys opinion to do it that way, and I did it that way. I mean, if -- if -- you know, I don't know how to answer it more clearly than that. I -- when I wrote that letter, it says what it says. And then if another letter or correspondence say something different for legal reasons, it's a legal reasons. It's not my -- it's not my conclusion.

**Q. Is it possible that you would have misstated facts as to ownership in order to obtain the liquor license for the LLC?**

A. No.

**Q. Then what facts are you relying on when you drafted this letter stating that Mr. Kanaan's ownership interest was eight percent?**

MR. GALLAGHER: Misstates his testimony. Did you testify -- I'm sorry -- that you wrote it -- that you drafted this letter?



THE WITNESS: No.

MS. GORDON: He just stated that he wrote the letter.

A. No, no. I said the letter was written by Mr. Murray. All this correspondence in dealing with ABC was done by Mr. Murray. I never did anything on my own without Mr. Murray's consultation and input and writing. All my correspondence with ABC was with Mr. Murray.

**Q. So you did not write this letter.**

A. I signed it, yes. Somebody wrote it on my behalf.

**Q. Did you read it and understand it before you signed it?**

A. I did. And I was advised to sign it and I signed it.

**Q. Are you in possession of any ledger or other record that keeps track of membership interests in the LLC?**

A. No.

**Q. Let's move over to Medical Equities for a moment.**

**When was the Medical Equities, LLC, formed?**

A. 1997, 1998, around that point.

**Q. And who were the members of Medical**



**Equities?**

A. Myself, Linda Seeley, and Nabih Kanaan.

**Q. Nabih Kanaan, the same as the plaintiff in this case?**

A. Yes.

**Q. And what were your ownership percentages of Medical Equities at the time of formation?**

A. 40 percent.

**Q. And what about the other two members?**

A. 30 each.

**Q. What was the purpose of the Medical Equities entity?**

A. The purpose was to establish medical practices through acquiring undervalued real estate, either medical real estate or office real estate converted to medical, and establish medical practices with those locations.

**Q. And were you a manager of Medical Equities as well as a member?**

A. No.

**Q. Who was the manager?**

A. Linda Seeley.

**Q. Was there ever an operating agreement in place for Medical Equities?**

A. I'm not aware of.



**Q. Is Medical Equities still in existence now?**

A. No. Medical Equity dissolved in 2013.

**Q. Why did it dissolve?**

A. Because the only asset it left was foreclosed on in 2013.

**Q. Was it a voluntary dissolution or involuntary dissolution?**

A. It's voluntary, but the foreclosure was involuntary.

**Q. Sure. Did the membership interests of Medical Equities change at any point from when it was formed until dissolution?**

A. Membership, no -- I mean -- yes. I'm sorry, I take that back. I just remembered something.

Yes, it did change.

**Q. What were the changes?**

A. I think Mr. Kanaan requested that his portion of the profit to be changed because he doesn't want to -- he doesn't want to file any taxes or something like that. And so he maintained his -- he maintained his membership 30 percent, but his proportion of profit/loss changed to negligible number. And then at the time, I have two children who needed tax deduction, so I think they have some equity each. I don't remember them -- the amount of equity

A. I don't remember. You know, his -- my relationship with the children are different. All what I remember is if he could facilitate the -- some kind of a settlement, you know, and -- and -- because he doesn't -- he doesn't want to contribute any more capital. The first time we have to go through crisis, then we have second crisis --
MR. GALLAGHER: You answered the question.
A. -- and I told him if he could help us out to settle that, and he said he would.
**Q. How did Mr. Kanaan's son say that he would help you settle the dispute?**
A. Talking to his father.
**Q. Do you recall about what time that was you guys started having those conversations?**
A. Around COVID time. Maybe 2020. 2020.
**Q. And what was the dispute at that time in 2020?**
MR. GALLAGHER: Objection. Vague as to "dispute," but you can answer if you understand.
A. Well, the dispute that we're having now. It's the same dispute.
MS. GORDON: Okay. If we could look at our next exhibit. This is the document titled Yaqub 0003 to 0005. It's screenshots of text messages. And that



will be Exhibit 7.
(Whereupon Exhibit 7, to be later marked, was referenced.)
THE WITNESS: This?
MR. GALLAGHER: No.
MS. GORDON: Do you guys have those?
MR. GALLAGHER: Almost. Okay.
**Q. Okay. So these are the copies that were provided in discovery so they're a little -- blurred isn't the right word, but faint. I'm not able to see the dates on them.**
**Do you recognize these series of text messages?**
A. Yes.
**Q. And are these between you and Mr. Kanaan?**
A. Yes.
**Q. Do you recall the dates of these communications?**
A. I don't recall independently, but the date should be there.
**Q. If you could please look at the bottom of page 2, the bottom right where it says, "Hi, For the last couple days."**
A. Yes.
**Q. It says, "Hi, For the last couple days, I'm**



**thinking about your text because I am not the one to tell you how much to sell it."**
**What is the "it" that you guys are talking about in this text message?**
A. I understood that means the hotel.
**Q. The hotel.**
**When -- what time were you looking to sell the hotel?**
A. I don't recall. Between 2'20 -- 2'20, 2'23, around that time.
**Q. Did you have a buyer -- a potential buyer?**
A. No.
**Q. Why did you want to sell it?**
A. Well, I mean, with COVID and that, we have to entertain our options and...
**Q. Why were you asking Mr. Kanaan what he thought you should sell it for?**
A. Asking him -- yeah, asking about what he wants for his interest.
(Stenographic reporter clarification.)
A. I was asking him to see what does he expect to have for his interest in the company.
**Q. And he states in that text message there that he believes that the interest split between the two of you is 70/30; is that correct?**



A. That's correct -- that's what he said, that's correct.
**Q. What did you believe his interest was at that time?**
A. I was shocked to hear that, and -- because that was not my understanding. And that is what -- what his interest is -- he is -- was interest to know how much he wants to go away.
**Q. What did you believe that his interest was at that time?**
MR. GALLAGHER: Objection. Calls for a legal conclusion, but you can answer as to your understanding.
A. Without having the date there, I -- it goes from zero to eight. How's that? I believe that -- or I think his interest used to be zero to eight.
**Q. Well, it would have to be more than zero if you were wanting to know what he wanted for his interest, correct?**
A. Not correct. Because I -- lots of times I pay people to go away. They don't deserve it though.
**Q. If you look at the last page of that exhibit, it's the follow-up text messages to the ones we just read. And it says -- you respond and you say, "Hi Nick, Traveling all day. Will talk to you**

**tomorrow."**
A. I don't have that here.
MR. GALLAGHER: The last page. It's right here, this little box.
THE WITNESS: Oh, okay.
A. Excuse me. I have to use my glasses here. Okay. I see that.
**Q. Do you recall if you did speak with him that next day?**
A. No, I do not.
**Q. Do you have any text messages -- well, I guess -- strike that.**
**Is that message of yours the last text message that you exchanged with Mr. Kanaan through the present date?**
A. That's correct.
**Q. So you and Mr. Kanaan have exchanged no text messages since this last message?**
A. Yes, no.
**Q. I'm sorry, is that yes or no?**
A. We did not exchange any messages since that. And I haven't spoken to him since that time because that 70/30 that came out of the left cheek make me very unhappy.
**Q. So you did not call him the next day when**



**you said, "Will talk to you tomorrow"?**
MR. GALLAGHER: Misstate -- objection. Misstates the witness's testimony.
A. I don't recall really. I did write it down. And I don't recall any content of that conversation.
**Q. So you -- you objected to his understanding that he had a 30 percent interest in the -- in the LLC, correct?**
A. That's understatement, yes.
**Q. So when did you speak to him after that text message to express your displeasure with his understanding?**
A. I don't think I ever did.
**Q. So he says to you in a text message that he understands that he owns 30 percent of the business and you never speak to him about it again.**
A. Because I asked Mr. Murray to handle this matter from there on. Became -- became a legal issue for me.
**Q. You testified earlier that those text messages that you guys were exchanging here in this exhibit were about 2022 to 2023, and Mr. Murray's letter is dated 2018.**
MR. GALLAGHER: Objection. Misstates the



witness's prior testimony. I believe he was not quite sure what the dates of these texts were.
A. I can give you what the dates are if you want.
**Q. That would be very helpful.**
A. Okay. Let me -- that's a good idea.
MS. GORDON: And if it's possible, Charles, if you guys can get me a clearer copy that has the dates on these, that would be great.
MR. GALLAGHER: If that's possible, yes, definitely.
A. That date was May 31st, 2018.
**Q. That text message from you back to Mr. Kanaan?**
A. Yes. May 31st, 2018.
**Q. So at this --**
MR. GALLAGHER: Yeah.
**Q. -- point in 2018, you would have been friends with Mr. Kanaan for almost 50 years; is that accurate?**
A. Correct.
**Q. And he expressed to you that he understood his ownership in the LLC to be 30 percent at that time, correct?**
A. Correct.



**Q. And instead of speaking to your friend of 50 years about it, you had an attorney send him a letter in June of 2018, correct?**
MR. GALLAGHER: Argument -- objection. Argumentative. But go ahead.
A. Yes, because it became very obvious, you know, he was -- it was clear through many documents, through many conversations, and to bring that up all of a sudden was very distressing, and it became a legal issue, and I couldn't get myself to talk to him.
**Q. You had testified that you had asked Mr. Kanaan for his signature to apply for the liquor license somewhere in the 2017 to 2018 time frame.**
**Was that over text message?**
A. No. That was through the attorney. Because after that, he retained an attorney and I retained an attorney, and everything -- communication was through attorneys.
**Q. Except for these text messages between you, correct?**
A. When we text messages, we don't have attorney. Mr. Murray was the company attorney, but he did not retain an attorney. But as soon as I retained an attorney and brought him the letter, he retained an attorney.

**Q. So did you request that Mr. Kanaan sign off on the application for the liquor license before these text messages in this Exhibit 7 or after?**
A. I don't recall. It is -- it is the communication between Mr. Murray and Mr. Kanaan and Mr. Kanaan first lawyer. That's the time we immediately asked and offered many incentive for him to sign it because we were in dire need for it.
(Stenographic reporter clarification.)
THE WITNESS: Because we were in dire need for it.
**Q. Exhibit 4 that we looked at prior, the June 1st, 2018, letter to Mr. Kanaan from your attorney, Mr. Murray, was that the first communication that your attorney had sent to Mr. Kanaan?**
A. I believe so. I'm not sure, but I believe so.
**Q. So when was the communication when your attorney asked Mr. Kanaan to sign off on the application for the liquor license?**
A. Must be after that, or during that. And he communicated also his attorney regarding this issue.
**Q. So you personally never asked Mr. Kanaan to sign off on the application for the liquor license?**
MR. GALLAGHER: Objection. Misstates the



witness's prior testimony.
MS. GORDON: I'm just.
MR. GALLAGHER: You can --
MS. GORDON: -- just asking.
MR. GALLAGHER: -- answer. Maybe I misunderstood. Go ahead.
A. I recall I did. You know, that we have liquor license -- they're asking for your signature, which I did not think we needed. And he -- he -- he said he won't do anything unless we give him the 30 percent interest in the company.
**Q. And do you recall when it was that you asked Mr. Kanaan to sign off on the application for the liquor license?**
A. Must be the end of '17, early '18. Just shortly after the -- the ABC requested his signature.
**Q. And was this -- do you recall, did you ask him via a phone call or --**
A. Phone call.
**Q. Do you recall what the response was from Mr. Kanaan's attorney to that June 1st, 2018, letter from your attorney?**
A. Do I recall whose response? I'm sorry, I missed it.
**Q. Do you recall what the response was from**



**Mr. Kanaan's attorney to the June 1st letter from your attorney?**
A. My understanding from Mr. Murray, that he told him he will not sign it unless we finish the issue of the percentage that he owns in the company.
**Q. Did you ever provide any documents to your attorney to evidence the -- I believe, as you call it, the redemption of Mr. Kanaan's membership interest in the LLC?**
MR. GALLAGHER: Objection. Just to clarify which attorney you're talking about, you're talking about Mr. Murray?
MS. GORDON: Mr. Murray.
MR. GALLAGHER: Okay. Go ahead.
A. No, there's no documents. I just told him the story I told you.
**Q. So you provided no paperwork or documents to Mr. Murray to assist him in preparing the June 1st, 2018, letter?**
A. That's correct.
**Q. And Mr. Murray was the same attorney who prepared the original operating agreement for the LLC; is that correct?**
A. What original?
MR. GALLAGHER: The original one that --



from 2000-whatever. '7 or whenever it was.
MS. GORDON: 2007.
MR. GALLAGHER: If you know.
A. I do know that an agreement exists. And I doubt it, but I don't know.
**Q. Okay. So when you testified prior today that Mr. Murray drafted the operating agreement, you were referring only to this first amended operating agreement that lists you as the sole member?**
A. That's correct.
**Q. Okay. Thank you.**
**When did you request the copy of the operating agreement, the original 2007 one, from the ABC?**
A. When they informed me that -- I wasn't aware there was an operating agreement. I wasn't aware it was required for the ABC. And they send me a question that we need the signature of other member, and so I ask him to send me the operating agreement to see what's going on.
**Q. And what other documents, if any, did the ABC send you besides the original operating agreement?**
A. I do not recall. I recall that we asked for the whole file, and they send us -- I don't recall the details of it.

**Q. Just let me know when you're done with the letter.**
A. I'm done.
**Q. Okay.**
MR. GALLAGHER: Okay, go ahead. We're ready.
**Q. So the first sentence of that letter dated June 8th states, "Although I understand that you've been in contact with Mr. Yaqub directly, I've not received a response from you to my letter of June 1st."**
**What direct communications did you have with Mr. Kanaan between May 2018 and June 8th, 2018?**
A. I do not remember. I know that we don't have text or email. I looked at those. We have nothing.
**Q. Do you recall having any phone calls with him during that time?**
A. I really do not recall at all.
**Q. From that last text message that we looked at, the May 2018 text message, through today, have you reached out to Mr. Kanaan at all as a friend to discuss anything besides the LLC?**
A. Not with him. With his son, as I mentioned earlier.



**Q. Uh-huh. What prompted you to stop all direct communications with Mr. Kanaan?**
A. The absurdness of his demands of something -- absurdness of his demands of something he knows and agreed to for years, and his continued not to contribute any capital and just, you know, being -- how should I put it -- not a good corporate citizens, to say the least.
**Q. And we don't -- I'm sorry, you're not in possession of any documents that were sent to Mr. Kanaan requesting additional capital contributions at any point from 2007 to the present?**
A. Other than Mr. Murray's letter to him.
**Q. In --**
A. -- (indiscernible cross talk) June 1st.
**Q. I'm sorry?**
A. Of June 1st letter.
**Q. In this Exhibit 8 that we're looking at, the third paragraph says, "It is my understanding that you have asked Dr. Yaqub to pay $250,000 for your interest."**
**When was that communicated to you by Mr. Kanaan?**
A. I don't recall, but must be between -- you know, just before June or something, before when we



were communicating, he might said that, That's what I want. You know, I don't recall specifically dates. It's a phone call. It's not anywhere in writing.
**Q. So you don't recall when that offer was communicated to you?**
A. No, I do not.
**Q. You had mentioned that you received a W-2 for one year from the LLC, and the rest of the years you received 1099s.**
**What was the first year that you received a 1099 from the LLC?**
A. 2017, I believe.
**Q. And, again, that was for management duties?**
A. Yes.
**Q. And what was the last year that you received a 1099 from the LLC?**
A. I haven't paid the taxes for '24. So '23 I received, yes.
**Q. Do you anticipate receiving one for 2024 as well?**
A. Yes.
**Q. You had mentioned earlier that you had assisted Linda when she was preparing taxes for the LLC.**
**Did Linda ever take distributions from the**



**LLC?**
A. No.
**Q. Did the LLC ever make any payments to you prior to 2017?**
MR. GALLAGHER: Objection. It's vague as to form of payment-type thing.
A. I do not recall, and I don't believe so.
**Q. If we can refer again to Exhibit 5, the first amended operating agreement.**
**Why was it backdated to December 1st, 2011?**
A. I have no idea. That's the attorney's advice, the attorney's execution, and I took my attorney's -- and I took my attorney's advice.
**Q. When Linda's ownership interest in the LLC was purportedly transferred to you in 2011, was it your understanding that it was 70 percent of the LLC?**
A. No. I understood it was 92 percent.
**Q. Did you have any communication whatsoever with Mr. Kanaan regarding your respective ownership interest in the LLC between 2011 and 2018?**
A. No. The only communication I had when we have that meeting in October -- in October 2009, and he agreed in front of me to reduce his capital to eight percent.
**Q. And you were not a member of the LLC at**

**that meeting, correct?**

A. I was not until my money came in.

**Q. Could you explain what you mean by that?**

A. I mean the funds that came -- it was a community property. It was my pension. So I have to agree to do it. And so it didn't matter if it's under Linda's name or my name, but -- that's my understanding.

**Q. So when money was taken from your pension to give to the LLC, it was your understanding that that was to purchase equity for you individually?**

A. No. Not necessarily, because Linda and I had a community property, and that money and this money both are community property. So it doesn't matter who -- whose name is it in.

**Q. How much money did you take from your pension to give to the LLC?**

A. I remember it wasn't one lump sum. In multiples, came up over 700,000.

**Q. And do you have records of all of these transfers?**

A. No, I do not.

**Q. What bank were they transferred from?**

A. I do not know. Linda was taking care of all the financials.



**Q. Did Linda get your authorization before removing money from your pension?**

A. It wasn't in a pension. It was designated as a pension, no. But she has full access to it, yes. She doesn't need my authorization.

**Q. What do you mean by "designated as a pension"?**

A. This is money we segregated. Because money that came from certain source, we designated that -- we marked to our pension and not to use it for anything. It wasn't in a pension plan or 401(k) or any -- or any, you know...

**Q. What type of account was it?**

A. She has both savings and checking. I don't remember which, you know. She was transferring money between different accounts. Might be investment also, the bank CDs and things like that.

**Q. And this was an account that you both had ownership of?**

A. I don't recall were both names on it or my name on it or her name on it. I don't recall. It is understood between us this is -- this is community money for our pension.

**Q. So Linda had full access and authority to this account and didn't need your permission to use**



**funds?**

A. Yes.

MS. GORDON: If we can next look at -- I'm going to designate this as Exhibit 9. It's Dr. Yaqub's resume.

(Whereupon Exhibit 9, to be later marked, was referenced.)

A. I have it.

**Q. Great. We're going to designate this as Exhibit 9.**

**So I see one of the businesses that you have listed there on page 2 is something entitled Hershey Medical Group?**

A. Yes.

**Q. And it has you listed as founder and president?**

A. Yes.

**Q. What type of business entity was that?**

A. I don't recall if it was subchapter S or a straight corporation. I don't recall. Probably subchapter S.

**Q. Was it formally organized with the California Secretary of State?**

A. I would assume. I don't remember, but must have.



**Q. And how many other owners were there besides yourself?**

A. I was the only owner.

**Q. You were the only owner of that one.**

**The next one above that I see is Family Health Resources.**

**Lists you as managing partner?**

A. Yes.

**Q. And how many other owners were there besides you of that entity?**

A. It varies, but -- varies between four and seven.

**Q. And were you a founder of that entity as well?**

A. Yes.

**Q. What organizational documents do you recall having executed to form that entity?**

A. I don't recall.

**Q. Do you recall that documents were executed to formally found the business?**

A. I assume. I wasn't doing it myself, but I assume it was organized as such.

**Q. And what type of entity was that organized as?**

A. I do not remember. I don't know if it was

times there is no distributions. And so it wasn't straightforward I owned one percent or four percent or three percent or whatever it is. It is the decision of the committee how to distribute that.
(Stenographic reporter clarification.)
THE WITNESS: Committee.
MR. GALLAGHER: Yes, committee.
**Q. What evidence was there for the committee to look at to determine what a doctor's ownership interest was?**
A. I don't recall. There's -- you know, they produce a report or whatever it was. Again, small, four to seven, depends on people in and out. And I don't recall the exact documents or what documents was kept.
**Q. Was there ever a dispute among the committee members as to how distributions should be shared?**
A. I won't call it dispute. It was discussions back and forth, and then committee decides.
**Q. So moving back to the LLC, when you took over as manager in 2011, did you ever call any meetings or the equivalent of a committee discussion with Mr. Kanaan to determine what distributions should**



**be shared?**
A. Every time he arrived to the hotel, which was frequent, there was a meeting. It was not necessary to have a formal meeting. That's the way they carried the business since 1998 between them, and I continued the way it was.
**Q. And at any of these multiple meetings, did you inform Mr. Kanaan that his ownership percentage was reduced from 30 to eight?**
MR. GALLAGHER: Objection. Asked and answered. Go ahead.
A. I -- yes. Many times. It was completely understood. He never objected to it. And he didn't even ask about it again. The first time he raised that issue is that text message. And I don't know why he raised it. I mean, it must be -- because it never come up what percentage he has. He understood it's eight percent, because in all the documents, everything we did. And that's what make me angry. Why all of a sudden even he bring it up?
MR. GALLAGHER: Okay. You've answered the question.
**Q. I believe you testified earlier that you did not convey to him that the ownership percentage had been reduced from 30 to eight because he will have**



**understood it.**
A. I (indiscernible cross talk) --
MR. GALLAGHER: Objection. Misstates the -- mischaracterizes the witness's prior testimony.
A. I -- I -- I was there when he said he doesn't -- it doesn't matter to me when his -- when his share was reduced. And from there on -- they have one tense meeting. The next day, they became amicable again, and he understood it's eight percent. Everything we did was that eight percent. He was there frequently. He visited the hotel. He looked at the books. We showed him profit/loss all the time. We showed him tax returns. And he never raised the issue, ever. The only time he raised the issue is when he wanted distribution, and we resolved the issue.
**Q. So you mentioned in the Family Health Resources business that there would be frequent discussions with other members where distributions would not necessarily reflect their ownership interests, correct?**
A. I did not -- any similars between the two -- the two organizations.
MR. GALLAGHER: (Indiscernible cross talk.) Yeah, that's good.



A. So I -- I -- these things come in a meeting, and we discuss it, but there's -- I don't understand the question, I guess.
**Q. Were there ever discussions between you and Mr. Kanaan at any point between 2011 and 2018 that his ownership interest would be at eight percent but his distribution would be at 30 percent?**
A. No.
**Q. But you are familiar with that concept based on your prior business experience, correct?**
A. No, because Mr. Kanaan is not -- or I, are not doctors. We don't have value to be added to distribution. But I -- it never happened and I never had that discussion that he would be distributed differently.
**Q. Were there any text message, email, or other written communications between you and Mr. Kanaan where he acknowledges or accepts that his ownership percentage is eight percent of the LLC?**
MR. GALLAGHER: Objection. Asked and answered. Go ahead.
A. It never came up, period. He doesn't have to send me a message. It never came -- never was a question.
**Q. Are you familiar with the laws applicable**

**to management of an LLC in the state of California?**
A. Very little. You know, vaguely.
**Q. Did you ever consult with an attorney or hire an attorney during your tenure as manager of the LLC to help with general compliance work for the LLC?**
A. No.
**Q. How did you ensure that you were complying with California's business regulations in your role as manager of the LLC?**
A. It's just my common knowledge and the way the LLC has been run for years, and I continued to run it the same way. And to -- making sure the LLC is paying its taxes, complying with the law, doing the things the manager need to do to keep the company in good standing.
**Q. When you say, "keep the company in good standing," what do you understand "good standing" to be?**
MR. GALLAGHER: Objection. Calls for a legal conclusion. But you can testify to your understanding now.
A. Understanding is to follow the local laws, be familiar with the labor laws and follow them, pay taxes, pay fees, ensure order in the place, and make sure the company is not liable for -- for negligence



or things of that sort.
**Q. What documents or rules did you reference from 2011 to the present date to ensure that you were complying with the applicable laws and regulations during your management of the LLC?**
A. I don't have any specific documents. I just look things up if the thing arise. Like, for example, the wage -- or not in compliance with the wage and look it up. If we are in compliance with the -- with the workman compensation and things like that, I look it up and I make sure that we are in compliance.
**Q. Did you ever look up anything with respect to compliance with your duties to minority owners of the LLC?**
A. Yes.
**Q. What did you look up?**
A. I just look up the LLC in general, and I looked up that my duty is to the company, and also to the members of the company. And -- and that's what I thrived to do. Thrived to do.
**Q. Did you ever personally -- well, scratch -- strike that.**
**Were you ever personally involved, either when you were manager or when Linda was manager, in**



**sending out notices of meetings to Mr. Kanaan for the LLC?**
A. No.
**Q. What reasons -- what are the reasons that you did not send any notices of meetings to Mr. Kanaan?**
A. Because the operate -- because the way they operated, they never have meetings or notices. They operated as informal, oral, congenial things, all their lives.
**Q. In your diligence in responding to document requests and looking for evidence in this case, did you find any documented evidence of meeting minutes or any other formal record of the meetings between Mr. Kanaan and Linda?**
A. No.
**Q. What about between Mr. Kanaan and yourself?**
A. No.
**Q. Was it your understanding that Linda's ownership was also your ownership jointly in the LLC?**
A. No. I won't say that. I understood it as a community property. Other than that, I don't have any interest in the hotel, really.
**Q. Are you aware of any documents evidencing certificates of ownership that Linda possessed for her**



**ownership in the LLC?**
A. No.
**Q. Can you please describe for me the decision-making process with respect to needing capital contributions from the members in 2017?**
MR. GALLAGHER: Objection. Misstates -- mischaracterizes prior testimony that they were considered capital contributions. Go ahead and answer.
A. Well, in 2017, we have a need for lots of capital. And I did what they usually to do, is to call each other and say, We need money and we need to solve that problem. They never have any formal request for capital contribution. This is just discussion. And -- and that -- and that was the issue then. It wasn't -- I never -- you know, they never did request anything inviting or formal or meetings, and I followed the same way they did before.
**Q. When you say "they," who are you referring to?**
A. Linda and Nick -- and Nabih Kanaan.
**Q. Can you describe the steps that were taken to divest Mr. Kanaan of his ownership interest?**
MR. GALLAGHER: Objection. Vague and ambiguous as to "divest."

BY MS. GORDON:
**Q. Oh, sorry, I can -- let's strike that. I can use a word that was used in the exhibit here.**
**Sorry. Can you please describe the steps taken for the redemption of Mr. Kanaan's membership interest in the LLC as described in the first amended operating agreement?**
A. The only thing I'm aware of is what Mr. Murray did. Nothing else we did. I have not taken any other steps.
**Q. What steps did you take to notify Mr. Kanaan of the redemption of his membership interest?**
MR. GALLAGHER: Objection. Asked and answered, but go ahead.
A. I did not communicate to Mr. Kanaan. Mr. Kanaan communicated through his attorneys with my -- with my attorney.
**Q. The communications with the attorneys didn't begin until 2018 though, correct?**
A. Yes.
MR. GALLAGHER: I'm sorry. Just maybe a point of clarification. Are you regard -- talking about from eight to zero or from 30 to eight? Both?
MS. GORDON: This is -- both. But starting



with 30 to eight.
MR. GALLAGHER: Thank you.
**Q. Go ahead, Mr. Yaqub.**
A. Yes. I -- I -- from the moment he said that he has 70/30 and it is the issue, I -- I put that in the hands of the attorneys, told them the story what happened. And that -- and that's what they did.
MR. GALLAGHER: I think she may be referring to -- and you can correct me if I'm wrong, Linda (sic), that you're referring to any communications going however from far back as to how he communicated that to Mr. Kanaan; is that correct?
MS. GORDON: It's Jennifer. And, yes, correct.
MR. GALLAGHER: Sorry. Jennifer, sorry. Linda, Jennifer. Sorry. Getting the names confused.
MS. GORDON: But, yes, that's correct.
A. The same answer. I think all of what I did, I told my attorney what happened and what the issues we have, and he took it from there.
**Q. When you became aware of the existence of the 2007 operating agreement and tendered it to your attorney, Mr. Murray, were there any steps taken to ensure that all prior acts were compliant with the operating agreement?**



MR. GALLAGHER: Objection. I think it misstates his testimony of how Mr. Murray got the operating agreement. But go ahead.
A. Yeah, I'm going to say the same thing. I'm not sure if I gave it to him or he recover it from recovering the file from the ABC. Either way, I do not know if he did anything with regard -- regarding the terms of that agreement and what's -- its importance and what -- and its -- it's something I did not -- I did not do.
**Q. Prior to executing the first amended operating agreement in December 2011, did you provide Mr. Kanaan with a cure period or any other opportunity to prevent the redemption of his ownership interest at that time?**
A. No, I did not.
**Q. Let me -- I'm sorry, let me just correct the record on that one.**
**The execution date of the first amended operating agreement was 2018 but is backdated to 2011.**
**At any point from 2011 through 2018, did you give Mr. Kanaan an opportunity to cure and prevent the redemption of his ownership interest in the LLC?**
A. Other than the meetings we have in 2009, I don't recall anything else. These are the two -- this



is the only times we ask him to contribute and he refuse. Even he agreed to those -- he agreed to two solutions that Linda came up with, one selling the inn, and he agreed to list it to sell it. When that failed, he agreed that she contribute alone and he reduce his capital.
**Q. And what steps were taken to memorialize that agreement?**
A. No steps. It's just -- just a meeting and shake hand and understanding between -- between friends.
**Q. Do you have any proof of Mr. Kanaan requesting that his percent of the profits be reduced for tax purposes or otherwise?**
A. Other than he received K-1 and he never objected. On multiple occasions, he told me, Don't send me the K-1s anymore. I don't care for them.
MS. GORDON: I think that's all that I have, Charles.
MR. GALLAGHER: Okay. I don't have anything.
THE STENOGRAPHIC REPORTER: Can I get transcript orders on the record, please?
MS. GORDON: Yes.
MR. GALLAGHER: Yes. Jennifer, how do you

like to handle that? Do you ever split that, or do we want to -- we can each get our individual copy? Reserve the right to have -- you and Mr. -- Dr. Yaqub's signature on the transcript. But as far as copies, we -- we want a copy. We can take electronically.

MS. GORDON: Yeah, likewise. And then we can just do the condensed, you know, four-pages-to-a-sheet version also.

MR. GALLAGHER: Yes, please.

THE STENOGRAPHIC REPORTER: So you're each ordering your own copy, correct?

MS. GORDON: We can split, Charles. I'm fine with that.

MR. GALLAGHER: Okay. Yeah. That's fine.

THE STENOGRAPHIC REPORTER: So that means the total bill is split between the two -- the original and two copies is split between the two parties; is that correct?

MS. GORDON: Yes.

MR. GALLAGHER: Correct. Yes.

THE STENOGRAPHIC REPORTER: All right. Thank you very much.

(Whereupon the deposition of NIZAR YAQUB



adjourned at 12:54 p.m.)

-oOo-



REPORTER'S CERTIFICATE

This is to certify that I, Cynthia A. Kennedy, Registered Professional Reporter and California Certified Shorthand Reporter, reported the within and foregoing VIDEOCONFERENCE DEPOSITION of NIZAR YAQUB, on THURSDAY, APRIL 17, 2025;

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness;

That said examination was taken by me stenographically and thereafter transcribed by me or under my supervision; and that the transcript of the deposition is a full, true, and correct transcript of said witness, including all questions, answers, and objections, if any, of counsel to the best of my ability due to the nature of hybrid remote depositions and the sometimes unpredictable audio malfunctions, interruptions, and disturbances therefrom;



_____ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____ Signature is Waived

_____ The changes made by the witness are appended to the transcript.

__X__ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further certify that I am not a relative or employee of counsel or any of the parties, nor am I financially interested in the outcome of the cause.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Witness my hand this 29th day of April 2025.

Cynthia A. Kennedy, CSR, RPR

NCRA Registered Professional Reporter
California Certified Shorthand Reporter No. 10415
License effective until November 30, 2025